**TELECHRON, Inc. v. TELICON CORP.**

Civ. A. 934.

United States District Court
D. Delaware.
March 8, 1951.

This is an action by Telechron, Inc. against the Telicon Corporation for trademark infringement and unfair competition. A preliminary injunction issued. D.C.Del., 70 F.Supp. 439. Final hearing was on plaintiff's right to a permanent injunction. Later, but before decision, defendant moved to reopen the case for the introduction of additional evidence. Proffer was to show "Telechron" was in the public domain. The motion was granted and the trial re-

opened. The matter is here for final decision.

James F. Hoge, Lenore B. Stoughton and George M. Chapman, of Rogers, Hoge & Hills, all of New York City, Hector M. Holmes, of Fish, Richardson & Neave, of Boston, Mass., and Hugh M. Morris and Alexander L. Nichols, of Morris, Steel, Nichols & Arsht, of Wilmington, Del., for plaintiff.

Philip Handelman, Elliot A. Wysor and Walter H. Schulman, of Handelman & Ives, all of New York City, for defendant.

LEAHY, Chief Judge.

I adopt most, if not all, of the original findings on the basis of which the preliminary injunction issued where I suspected infringement; unfair competition; prospective potential confusion; and actual confusion.[1]

### Trade-Mark Infringement and Unfair Competition Issues

1. The first question is whether the factual burden of proof has been assumed by plaintiff. Plaintiff began to use its mark Telechron in December 1919. It registered on November 13, 1923 (No. 175,808) for clocks and on August 5, 1924 (No. 187,400) for electric motors; both registrations have been renewed.[2] Plaintiff's use of its mark has been continuous. Mr. Kokins, who had been with plaintiff since 1926, testified to his personal knowledge of continuous use of the mark since that date and before,[3] and PX. 1 was identified showing gross sales, as to number of units and money value, and general advertising expense for various Telechron products from 1923 through the first ten months of 1948.[4] The figures of PX. 1 show extensive and long-continued use of Telechron and the large amount of national advertising. These figures do not include extensive dealer advertising.[5]

In addition to its name-use on electric clocks and motors it has been used in the radio field. PX. 1 lists various Telechron products including electric clocks, master clocks, motors, preselectors, radios, switch alarms, and timers. Kokins[6] discussed the Telechron electric clocks for household and commerical uses, motors and instruments for timing purposes such as time switches and other devices; preselectors, switch timers, radios, master clocks, range signal timers and other switch timers; and the world time clock, chiefly for radio users. The last war caused a limitation of plaintiff's manufacture of articles to which it applied its mark, but the use throughout the period of the war was continuous. Mr. Mitchell[7] testified that during three years beginning in 1943, "because of governmental regulations, we were limited in the production of clocks to alarms, so that we were unable at that time to make the preselectors"; but PX. 1 shows continuous sales of other Telechron products, and an interval of only three war years with preselectors.

Plaintiff has used Telechron as part of its corporate name since April 1926. Plaintiff was organized in May 1914 under the name of Warren Clock Company. From 1926 until May 1, 1946 its name was Warren Telechron Company. From May 1, 1946 its name has been Telechron, Inc. A certified copy of the charter with certificates of amendments of the changes of name in 1926 and 1946, is in evidence;[8] Kokins testified with respect to the successive names;[9] and Mitchell testified that the change to Telechron, Inc. was discussed with approval by plaintiff's Board of Directors on October 22, 1945, with action

---

1. In 70 F.Supp. 439, 442, I stated in general I opposed "trial by affidavits" but, as to the case at bar, " * * * this is a case where I fail to see what new proof could be offered which would be of assistance in determining the bare legal questions involved. There is little dispute of fact; and a 'full dress trial' would simply present the same issues."

2. PX. 25 and 26.

3. Tr. pp. 10–11, 16, 19, 23.

4. Mitchell Dep. in PX. 61, pp. 4–6.

5. Tr. pp. 207–8.

6. Tr. pp. 15, 24–5, 27–8.

7. Mitchell, ibid., p. 6.

8. PX. 27, Tr. pp. 7, 9.

9. Tr. pp. 11, 12.

taken at a meeting on April 1, 1946.[10] The change of corporate name was made because wide advertising of plaintiff's mark Telechron had caused it to become familiar to the public. Kokins [11] so testified and explained that for some years, and before the appellation Warren was dropped from the corporate name, plaintiff had inserted an advertisement in the Manhattan (N. Y.) telephone directory on the "Tel" page because the public was looking for plaintiff's name under Telechron rather than under Warren—to the extent that plaintiff had tried in about 1940 to 1942 to get listed under the name Telechron.[12] Mr. Bigelow testified before Warren was discontinued in the corporate name letters were frequently received, addressed to Telechron Clock Company, or Telechron Company, or some similar designation without the word Warren.[13] Letters so addressed were commonly received and for a substantial period of time, and specimens are in evidence.[14]

Defendant on June 1, 1942 changed its name from Telectron Corporation to Telicon Corporation. It was organized on May 21, 1942 under the former name. Thereafter, defendant began the manufacture of piezo electric crystals which are devices for controlling frequency in radios, types of radio transmission and clocks. Such crystals are used in connection with radio and television transmitters and receivers, and clocks.[15] Defendant has been in the radio field since November 1945 although its advertisements since 1944 show its prime purpose is to operate in the radio and television fields. DX. 25 and 26 are Telicon advertisements which appeared in "Electronics" for October 1944 and January 1945.[16] Its earliest marketing of a Telicon radio was in the Spring of 1946 and the earliest consumer advertising of defendant's radios

was in March 1946. The earliest such advertisement in the record is DX. 22, published by R. H. Macy Department Store on March 14, 1946.[17] DX. 23 and 24 are advertisements published by other concerns in June and July 1946.[18] It would appear the Telicon television receivers were first shown to the public in October 1946.[19]

In 1931 plaintiff sold Telechron electric clocks to RCA to be used with radio sets which RCA was manufacturing. Approximately, between 5600 and 5700 clock assemblies were sold in 1931 to that company.[20] Also in 1931 plaintiff sold 3000 of its electric clocks to Grigsby-Grunow Company to be placed into the Majestic radios of that company.[21] The dials of these radio clocks all had the trade-mark Telechron. Mr. Fisher so testified; he produced a sample of the dials; and a photostat of the Majestic dial is in evidence.[22] In 1934, 5000 of plaintiff's clocks bearing the same trade-mark were sold to Atwater-Kent Company. Kokins stated clocks were sold to Atwater-Kent prior to 1940.[23] Fisher testified to the sale in 1934 of approximately 2600 to 2700 clock movements to Atwater-Kent for use in their radios, and produced a sample of the Atwater-Kent preselector clock unit with a Telechron nameplate on the back casing.[24]

In 1935 plaintiff offered for sale under its mark a preselector to be plugged into a radio and adjusted to turn the radio on and off at pre-set intervals. This preselector enables the radio to be used as an alarm clock as it may be set to turn on the radio at whatever hour one desires to awake. Kokins discussed the Telechron preselectors or switching devices and their use in turning on radios and other appliances [25] and the very similar Telechron

10. Mitchell, ibid., pp. 7–9.

11. Tr. pp. 11–14, 13–15; PX. 29.

12. Mitchell, ibid., p. 10.

13. Bigelow Dep. in PX. 61, p. 17.

14. Bigelow, ibid., pp. 18–19, 20; and PX. 4.

15. Baldwin Dep. in PX. 63, pp. 60–9, 74–7; PX. 13, 14 and 15.

16. Tr. p. 275.

17. Tr. p. 270.

18. Tr. pp. 272–3.

19. Tr. pp. 261–2.

20. Fisher Dep. in PX. 61, p. 50.

21. Fisher, ibid., pp. 50–1; Tr. 50–1.

22. Fisher, ibid., pp. 50–1; PX. 7.

23. Tr. p. 52.

24. Fisher, ibid., pp. 51–3; PX. 8.

25. Tr. pp. 24–5, 29–30, 31.

switchalarm, also used in connection with radios. He stated the original Telechron preselector unit was started in 1935 and is still being sold. The figures showing substantial use appear in evidence;[26] the manner of use by the radio user appears in advertisements.[27] Kokins' testimony shows plaintiff was "interested in thinking about the possibility of using Telechron synchronizing devices, apparatus for controlling television."[28] Plaintiff sells a large proportion of its preselectors to radio manufacturers for incorporation in their radio sets.[29]

These preselectors were advertised and sold from 1935 to 1942, at which time production was stopped. Mitchell testified that for three years beginning with 1943, governmental regulations limited plaintiff's production of clocks to alarms, so that plaintiff was unable to make the preselectors.[30] The sales figures from 1935 to 1943 and from 1945 to November 1948 are set forth in PX. 1. After war production had been resumed, sales figures for 1946 and on through the first ten months of 1948 show more than 125,000 preselectors were sold during the whole period from 1935 on and they are still being sold.[31]

In 1937 plaintiff offered the Telechron world time clock. This item put out in 1937 sold up to 1940, but dropped in 1941 when the war came on. It was then adapted for use with radio communication. It shows the time throughout the world and is used with short wave radio receiving sets.[32]

During the war, plaintiff produced a clock for the armed services for timing radio signals and radio communications. These were sold to the Army, Navy, Maritime Commission and Signal Corps and became known to thousands of radiomen in the armed services. This clock was produced at the request of the Army and Navy chiefly for use in communication centers. PX. 39 lists its many uses, and "quite a few thousand" of these clocks were sold to the armed services during the war.[33]

In 1940 plaintiff began plans for a Telechron radio with a built-in preselector. The idea was to put out a radio with an alarm combination, so that by means of the selector mechanism the radio could be set to come on when desired. (This was the radio which was subsequently marketed as the Telechron Musalarm.[34]) In 1941 these plans were set aside because of the war, although a sample was made, and plans had to be dropped because plaintiff was then concerned more with war work than the development of new devices.[35] In 1944, as war demands relaxed, work on this project was resumed. The plan was revived as soon as plaintiff had time to concern itself with new devices; the plans were made and the production of a chassis was authorized in 1944.[36] Plaintiff's sales representatives were notified of the new line in April 1945. Plaintiff's district managers were requested to estimate what the demand would be. PX. 42 is a copy of a notice dated April 2, 1945 and sent to all district managers, announcing the products intended to be put out in 1945, including the radio;[37] PX. 59 is an order received in August 1945 for 5,000 of such radios.[38] It had intended to bring the radio out earlier in 1945[39] but there was delay in making the molds and delay in getting plastic materials for the case.[40] In October 1945 samples were submitted to all of the district managers so that they could show customers what plaintiff intended to sell.[41]

Demands of distributors exceeded plaintiff's productive capacity; and response

26. PX. 1.

27. PX. 40.

28. Tr. p. 64.

29. Tr. p. 90.

30. Mitchell, ibid. p. 6.

31. Tr. pp. 30, 89; PX. 1.

32. Tr. pp. 27–8.

33. Tr. p. 28.

34. Tr. pp. 31, 49.

35. Tr. pp. 31–2, 34.

36. Tr. pp. 34, 56–7.

37. Tr. p. 35.

38. Tr. pp. 211–12.

39. Tr. p. 57.

40. Tr. pp. 37–8.

41. Tr. pp. 36, 58, 95.

from district managers was enthusiastic; they said the item would sell in large quantities. Plaintiff could not promise the quantities and had, therefore, to allocate.[42] Beginning in December 1945 plaintiff advertised radios to the trade. PX. 43 is a Telechron bulletin of the new radio, which was sent to the district managers and also to distributors.[43] The Telechron radio was advertised quite extensively to the consumer public prior to the time when plaintiff could fill any demand for it.[44] PX. 52 is a Telechron Musalarm advertisement which appeared in the Saturday Evening Post of May 25, 1946. Actual distribution of the product was in June. By October 1946, 39,291 of plaintiff's radios were on the market. There was one model in 1946 and another in late 1947 or 1948.[45] PX. 1 and DX. 7 show the gross sales figures including 90,405 radios in 1946, 186,739 radios in 1947 and 70,775 in the first ten months of 1948.[46] Plaintiff was still selling radios at the time of the trial,[47] and plans have been under way for a new model to be out.[48]

2. Facts show clearly the good-will attaching to plaintiff's trade-mark Telechron. Five basic factors were noted in my earlier opinion [49] on the preliminary injunction. Since then, they have been established after full trial. They are 1. The wide use of Telechron synchronous motor which since 1924 has sold 5,500,000 for sales prices of $9,000,000; [50] 2. the wide sale of the Telechron masterclock which is used to control the frequency of the alternating current output of power stations and which is used by 99% of electric power stations in the United States; [51] 3. the great distribution of the Telechron electric clock of which 7,000,000 have been sold at sales prices of more than $25,000,000; the Telechron clock was the first electric clock; and they have been sold in nationwide distribution.[52] For several years the Telechron was the only electric clock on the market; today approximately 30% of all electric clocks are TELECHRON clocks; [53] 4. plaintiff's advertising—which consists of distributing 100,000 catalogues each year to dealers, distributors and consumers, and circulars to the amount of 750,000 each year—which shows between 1924 and 1945 advertising expenditures of $3,168,398; [54] and 5. the sale of Telechron products through the same outlets as pertain to radio and electric appliance equipment throughout every state through 580 wholesale distributors. The Telechron products such as radio clocks, radios, preselectors, and so on, are sold in radio stores, department stores, through jewelry stores, throughout the country, and they are handled by very close to 700 wholesale distributors and between 75,000 and 100,000 retail dealers.[55] Several of defendant's witnesses testified to the sale of Telechron radio sets, Telechron clocks, and Telicon radio sets in the retail stores with which they are connected.[56] These are the same outlets which would buy and deal in piezo electric crystals and other electrical and radio equipment. The crys-

42. Tr. pp. 36-7.

43. Tr. p. 37.

44. Tr. pp. 38, 209.

45. Tr. pp. 77, 209; Mitchell, ibid., p. 12.

46. Mitchell, ibid., pp. 4, 6; Tr. pp. 86-7.

47. Tr. pp. 61, 79, 213.

48. Tr. pp. 213-4, 239-40.

49. 70 F.Supp. 439, 440-41.

50. PX. 1.

51. Tr. pp. 16, 18.

52. Tr. pp. 23, 26.

53. Tr. p. 27.

54. This is confirmed and supplemented by the advertising expense figures set forth in PX. 1, by specimen advertisements, catalogues, and bulletins in evidence as PX. 29, 30, 31, 33-40 inclusive, 45, and 49-54 inclusive; by PX. 55-58 inclusive, consisting of lists of magazines in which Telechron advertisements have appeared; and by the testimony describing and identifying these exhibits (Tr. pp. 16, 17-18, 20-23, 24-26, 28-29, 30 and 204-211); see also Mitchell, ibid., p. 6, and Tr. pp. 207-208, as to a considerable amount of dealer advertising in addition.

Tr. pp. 39, 40.

56. DX. 17; Smith Dep. pp. 3, 4, 15; Bolet Dep. pp. 49, 50, 52, 54; Stein Dep. pp. 58-9, 68-9; Curtis Dep. pp. 96, 98, 108; Haizen Dep. pp. 116-17, 119, 127.

tals and crystal assemblies are sold at retail stores which normally carry radios and electric clocks.[57]

3. After my first consideration of this case I observed [58] that "Both to sight and sound Telechron and Telicon are similar. The mere utterance of the two words approaches an absolute identity in sound." I pass over the particular defense of the dissimilarity of one style of printing Telechron and one style of printing Telicon, for the former is used both in script form and in other styles of type,[59] on plaintiff's several structures "depending upon the type of design",[60] and on letterheads and business papers.[61] Defendant's Telicon is printed in different styles, too.[62] The reality, here, is—aside from the printer's art—not only prospective potential confusion but also present live confusion. Evidence of actual confusion with respect to the two marks was demonstrated:

Mrs. R. C. Desenberg, Sr. She lives in York, Pennsylvania. She bought a Telicon radio in 1946. She owned two electric clocks with the name TELECHRON on them for about eight years. She thought the same people made the clock and the radio. She bought the radio "thinking it was the same people that I had the clocks from". The radio was not satisfactory and she sold it.[63] When Mr. Chapman (one of plaintiff's attorneys) came to see her husband, she thought he was from Telicon, the radio concern, and that is when she found out it was two different companies [64] "although I had my clocks a long time, but I thought it was from the same place". She was under the impression the radio was by the same manufacturer as the clocks, which are marked "Telechron".[65]

The radio had "Telicon" on it.[66] The type of the two words is different but "you must admit they sound alike".[67] She never noticed the difference; never knew it until about two months before the trial.[68]

Mr. Desenberg, her husband, also testified. He paid $175 for the radio; had a new record player put in it and had different radio men come in and look at the radio. "They couldn't fix it." He sold it for $125.[69] He thought defendant's radio was a "lemon".[70] When he wrote a letter of complaint he thought it was the same company that had made the clocks. He got the Telicon name off the radio. His letter had nothing to do with clocks but he thought it was all the same company.[71] When Chapman came, Desenberg said "he mentioned the Telicon name and right there I blowed my top. Then he said he was from the Telechron Company. Then I looked. I didn't know until that day that it was two different companies that sounded very near alike like that. I was under the impression it was the same company."[72]

Mr. Gherman H. Haines of Price Electric Corporation, Frederick, Maryland, testified with respect to PX. 47 and 48. In June 1946 he was requested to communicate with Telechron Corporation about a synchronous motor his company wanted. He prepared the telegram and phoned it to Western Union. He sent the telegram to defendant's address, 851 Madison Avenue, New York City, an address he obtained from the New York-Manhattan phone directory. That was his first contact with the Telechron Company; he had never heard of the Telicon Company, and had never heard the name Warren in connection with Telechron.[73] When he looked

57. Baldwin, ibid., p. 63, PX. 13.

58. 70 F.Supp. 439, 441.

59. Tr. pp. 73, 74.

60. Tr. pp. 205, 239; PX. 39 (Telechron clock catalogue with six different models in block letters); PX 45 (various styles, "Electronics", Nov. 1945).

61. Tr. pp. 205, 224, 225, 226.

62. Tr. pp. 226–27.

63. Tr. pp. 111–113.

64. Tr. pp. 114, 128, 130–1.

65. Tr. p. 123.

66. Tr. p. 125.

67. Ibid.

68. Tr. pp. 126, 127.

69. Tr. pp. 132–135.

70. PX. 46; Tr. p. 135.

71. Tr. pp. 138–39.

72. Tr. pp. 135–36.

73. Tr. pp. 147–51, 153.

Telechron up in the phone directory, "I came upon this name which now turns out to be Telicon. It was late in the evening and I was anxious to go home, and I assumed that was what I was looking for. I put the address down and just neglected to check the spelling of the telephone directory and what I had previously put on the blank. I found what I thought at the time was what I was looking for, which now turns out to be Telicon. I was looking for Telechron * * * and just through haste I just found the word 'Telicon' and assumed that was what I was looking for."[74]

Carl L. Titus identified PX. 5, a letter and envelope of Armour Research Foundation, dated June 21, 1946 and addressed to "Warren Telicon Company", inquiring as to one of plaintiff's products. "Warren Telechron Company" was intended and both Mr. Titus and his secretary were confused. Titus dictated and signed the letter but did not notice the name was Telicon rather than Telechron when the letter came back to him from his secretary. He said "the extreme likeness of the two names made it—well, made it not noticeable that there was actually an error in the spelling of the word, 'Telechron', for whom I intended the letter" and "the extreme likeness of these two names would most certainly confuse a secretary to whom such a letter may have been dictated. Miss Seymore had been with me for approximately three years and was well acquainted with the files. However, again the likeness of the names confused even her."[75]

Confusion is found where on three instances orders were received for plaintiff's radios (Telechron) and defendant filled those orders and sold its own radios (Telicon). Eric H. Palmer was employed at Fordham Radio Supply on June 25, 1946, when Mr. Piper called there and asked him to order a Telechron radio from Telicon Corporation. Palmer telephoned Telicon Corporation and inquired about a Telechron radio, and was told they could supply a Telechron table model. He then made out an order and mailed it to defendant. About July 15th a messenger arrived from Telicon with a radio in a carton bearing the word Telicon. He and Piper examined the radio and found it was a Telicon radio.[76]

Defendant admitted X. 3 to plaintiff's Request for Admissions[77] was a true copy of an order received by defendant from Veterans Amusement Co. for a "Telechron" radio, and that a "Telicon" radio was shipped in response to this order.

Harold A. McGee testified about the letter written by Kolman Grollman of Grollman Hardware, Inc., to defendant, requesting a "Telechron" radio table model, and identified the "Telicon" radio received by Mr. Grollman.[78] Defendant admitted that X. 1 to plaintiff's Request for Admissions[79] was a true copy of the order received from Grollman for a "Telechron" radio, and that defendant shipped to Grollman a "Telicon" radio in response to this order.

A clerk in Macy's radio department when asked to point out plaintiff's product was concerned with demonstrating defendant's product. Piper, accompanied by his wife, asked the clerk at Macy's if they had the Telechron radio; the clerk said he did, and led them over to a Telicon set.[80] There were other instances of confusion on the part of many other store employees of different concerns. On June 28 and 29, 1946, Piper, accompanied by his wife, visited eight department stores in New York and Brooklyn.[81] Piper's instructions were to find the stores which sold Telicon radios. He had Mr. Precious make this preliminary investigation.[82] Piper then called on some of these stores to ask for Telechron

74. Tr. pp. 154-5.

75. Titus Dep. in PX. 62, pp. 4, 5, 6.

76. Palmer Dep. in PX. 63, pp. 2, 3, 4, 5, 8, 9, 26, 27, 29, 53; PX. 9.

77. PX. 68.

78. McGee Dep. in PX. 63, pp. 94-5, 101-04; PX. 18, 20, 68.

79. PX. 68.

80. Tr. pp. 165-66.

81. Tr. p. 164.

82. Precious Dep. in PX. 63, p. 83.

and see what happened.[83] On the same day at Bloomingdale's he asked the clerk if they had a Telechron radio and the clerk replied: "Telicon? We have a table model".[84] On June 29th Mr. and Mrs. Piper called at a Davega Radio Store, and Piper asked the clerk if he had a Telechron radio. The clerk said "Yes" and led them over to a Telicon radio and phonograph combination. Piper asked "Is this Telechron made by the same manufacturers who make the Telechron clock and radio combination where you set the time for arising before going to bed the night before?" and the clerk said "Right, yes, that is right."[85] On June 29th Mr. and Mrs. Piper went to the Namm Department Store in Brooklyn. Piper asked the clerk there if they had a Telechron radio. The clerk said "Yes" and after further talk led them over to a Telicon radio and phonograph combination with a tag marked "Telecon". In the course of talk with the clerk Piper asked if this radio were made by the same people who made the Telechron clock and radio combination, and the clerk said "Yes, but I believe that G. E. makes a Telechron combination like that also." Asked if the manufacturer of the radio also makes a Telechron clock and radio combination, the clerk replied "Yes".[86] On June 29th at Michael Bros. Department Store in Brooklyn, Piper asked the clerk if they had a Telechron radio, and he said "Yes", pointing to a Telicon radio and phonograph combination.[87]

The names under which the parties did business show the corporate names are likewise strikingly similar. True, at the time defendant began to use Telicon, plaintiff's Telechron was not the sole element of its corporate name. But, Telechron was its mark and the predominant word in its corporate name; and both its products and its business had been generally known by the use of the word Telechron. Apprised of invasion, plaintiff acted promptly to protect its right. Plaintiff first learned of defendant's Telicon in January 1946. One of G. E.'s patent attorneys had for over twenty years presided as guardian angel in protecting plaintiff's mark Telechron. In January 1946 he saw in the Patent Office Gazette publication of the mark Telicon for piezo electric crystals. G. E. then recommended that plaintiff should institute proceedings in opposition. At once, such action was instituted.[88] It was not until May 1946 that plaintiff learned of defendant's use of Telicon with radios. Kokins, then plaintiff's president, learned of it in May or June through a letter from one of plaintiff's agents.[89] Mr. Blair, plaintiff's sales manager, received that letter with a Telicon radio advertisement attached in May 1946, and that was the first time he had heard of Telicon.[90] Mitchell first heard of Telicon Corporation in June of 1946 in connection with the opposition proceeding.[91] Mr. Warner, the attorney who had seen the Telicon trade-mark application in relation to piezo electric crystals, did not hear of the use of Telicon in connection with radios until June 1946 when he attended a meeting at Mr. Holmes' office for preparing testimony in the opposition.[92]

After this, plaintiff investigated defendant's activities; then followed the formal infringement notice and the institution of the case at bar. Piper was engaged to make an investigation with respect to Telicon radios in the summer of 1946, and he and others under his direction worked on it in June 1946 and later.[93] The complaint herein was filed on September 20, 1946, and the answer admits plaintiff had given defendant written notice of infringement and unfair competition. Although proceedings in opposition made known to defendant that plaintiff challenged the use of Telicon, de-

83. Tr. pp. 173–4.

84. Tr. p. 167.

85. Tr. p. 168.

86. Tr. pp. 192, 169, 170.

87. Tr. p. 170.

88. Warner Dep. in PX. 61, pp. 30–32; Tr. pp. 40–1.

89. Tr. pp. 41–2.

90. PX. 60, Tr. pp. 214–15, 217, 230–31.

91. Mitchell, ibid., pp. 9–10.

92. Warner, ibid, pp. 44–5.

93. Tr. pp. 161, 172, 176, 186–88.

fendant thereafter commenced advertising its product and in the Spring of that year (1946) offered its radio product for sale. Plaintiff's opposition was filed in January 1946.[94] The earliest Telicon radio advertisement in the record is DX. 22, published March 14, 1946.[95] The first showing of samples of Telicon television receivers was on October 10, 1946.[96]

4. There are two issues here involving plaintiff's rights and defendant's trespass. They involve trade-mark infringement and unfair competition. They arise out of the same facts but "are not separate causes of action, but different grounds asserted in support of the same cause of action." [97] Trade-mark infringement and unfair competition are related because "the common law of trademarks is but a part of the broader law of unfair competition." [98] But, the cause of action —in this case plaintiff's right to protect its Telechron name, trade-mark and goodwill against infringement and invasion by confusingly similar name and trade-mark Telicon on the same and related goods— *must be assayed for each ground for relief.*

a. The trade-mark infringement is a statutory question because plaintiff's mark is registered.[99] Plaintiff, if successful, is specifically entitled to injunction, accounting and other relief where there is a "colorable imitation" of the registered mark "upon or in connection with the sale of merchandise of substantially the same descriptive properties as those set forth in such registration".[100]

b. While the issue of unfair competition calls for application of common law and equitable principles, facts which support a suit for infringement and those which form the basis for unfair competition are substantially the same.[101]

c. Yet, under the broader view of unfair competition, circumstances may create equitable relief although there is no statutory trade-mark infringement.[102] In fact, I sat on a case in our Court of Appeals where Judge Forman pointed out the propriety of considering the two issues of mark infringement and unfair competition.[103] He wrote: "The counterclaim sets forth two causes of action, although not separately stated—one based upon infringement of trade-mark and the other based upon unfair competition. The trial court dismissed the counterclaim. The finding of invalidity justified this action insofar as the counterclaim sought a remedy for infringement. However, the trial court failed to find acts sustaining the dismissal of the counterclaim insofar as it dealt with the charge of unfair competition. The determination alone that Over-Tone is invalid is not dispositive of the issue of unfair competition. The invasion of the common law rights of Over-Tone alleged in the counterclaim upon which it prayed for relief therein is in issue. At least some evidence pertaining thereto has been introduced, and a determination should have been made as to whether or not it is a fact that Overglo engaged in unfair competition against Over-Tone and the legal conclusions to be drawn therefrom."

94. Tr. p. 41.

95. Tr. p. 270.

96. Tr. pp. 261–2.

97. Hurn v. Oursler, 289 U.S. 238, 246, 247, 53 S.Ct. 586, 590, 77 L.Ed. 1148.

98. Hanover Star Mill Co. v. Metcalf, 240 U.S. 403, 413, 36 S.Ct. 357, 360, 60 L.Ed. 713.

99. Under the Act of Feb. 20, 1905, 15 U.S.C.A. § 81 et seq., now 15 U.S.C.A. § 1051 et seq.

100. 15 U.S.C.A. §§ 96, 99, 100, 103, now 15 U.S.C.A. §§ 1051 note, 1057(b), 1114 et seq.

101. Armstrong Paint & Varnish Works v. Nu-Enamel Corp., 305 U.S. 315, 325, 59 S.Ct. 191, 83 L.Ed. 195; Moxie Company v. Noxie Kola Co. of New York, Inc., D.C.N.Y., 29 F.Supp. 167, 172.

102. Vogue Co. v. Thompson-Hudson Co., 6 Cir., 300 F. 509.

103. House of Westmore v. Denney, 3 Cir., 151 F.2d 261, 266, Biggs, C. J., Forman and Leahy.

### Infringement

■ Any simulation of a mark which has the potential to induce the ordinary purchaser to buy the merchandise to which the mark is affixed as the product of the owner of the mark, infringes and equitable relief will be granted.[104]

1. Telechron is registered as to electric clocks and motors but used with a variety of switching and timing devices. It has been applied to switch and range timers, preselectors, and radios. The Telechron motor is a part of its clock. Radio use began in 1931 and continued by mutations to the war in connection with timing radio communications when the radio plan was deferred until Telechron's radio production entered the field in 1945. The trade field of both plaintiff and defendant appears to move in the same trade channels. Piezo electric crystals are used in radio and television and electric clocks. Where goods are of the same descriptive properties, have an identity of items and may be used together as parts of a set, sold by the same dealers and to the same class of the purchasing public, there is the possibility they may be regarded as emanating from the same source.[105]

■ 2. The test of "colorable imitation in commerce" suggested by the statutory prohibition is not an analytical difference between marks of two competing products when placed in juxtaposition, but whether a sensory difference will be recognized by the ordinary purchaser when he does not have the opportunity for comparison—i. e., whether a deceptive similarity exists when average buyer is unable to distinguish defendant's name or mark from his recollection of plaintiff's mark.[106] Short of this, resemblance constituting infringement is incapable of exact definition.[107] A recent application of the rule suggested a practical test. In La Touraine Coffee Co. v. Lorraine Coffee Co., 2 Cir., 157 F.2d 115, 117, Judge Clark wrote: "To establish infringement, plaintiff need show only that the name adopted by defendants is so similar to its trade-mark as to be likely to cause confusion among reasonably careful purchasers. Defendants urge that there has been no showing of actual instances of confusion; but no such evidence is required. * * * The only question is whether or not the similarity of names is such as to make likely the deception of any appreciable number of ordinary prudent customers.

"While the trial judge * * * concluded otherwise, we are constrained to think it is. * * * Defendants have attempted to distinguish 'Lorraine' from 'La Touraine' on the basis of the number of letters and syllables in the words, but this form of technical gymnastics is not determinative. See Celanese Corp. of America v. E. I. DuPont De Nemours & Co., 33 C.C.P.A., Patents, 857, 154 F.2d 143. The initial letters and the last syllables—probably the parts of any word which impress themselves most firmly upon the memory—are identical. The similarity is, of course, most striking in oral speech; a call for one in a store is likely to produce the other. Except on the tongues of precisionists, both sound alike * * *".

104. Layton Pure Food Co. v. Church & Dwight Co., 8 Cir., 182 F. 24, 34.

105. National Bellas Hess, Inc. v. RCA Mfg. Co., Inc., 50 U.S.P.Q. 467 (radio receiving sets and piezo electric crystals); Colonial Radio Corporation v. Colonial Television Corp., D.C., S.D.N.Y., 78 F. Supp. 546 (radio receiving apparatus and parts and television receivers); Mohawk Electric Corp. v. Rollinson, 58 App.D.C. 127, 25 F.2d 551 (radio receiving sets and rectifiers, transformers, loud speakers, and other electrical goods); First Industrial Corp. v. Micro Products Corp., 72 U.S.P.Q. 175 (radio frequency transformers and other radio parts, and various types of switches used in radio and radar equipment as well as in other electrical applications); Yale Electric Corp. v. Yale & Towne Mfg. Co., 56 App. D.C. 242, 12 F.2d 183 (locks, keys, and other hardware and batteries, battery cells, flash lights, and Christmas lighting outfits); and see, in accord, the decision by Judge Learned Hand in Yale Electric Corp. v. Robertson, 2 Cir., 26 F.2d 972.

106. The Best Foods v. Hemphill Packing Co., D.C.Del., 5 F.2d 355, 357.

107. McLean v. Fleming, 96 U.S. 245, 251, 245 L.Ed. 828.

To me at least, Telicon is a colorable imitation—an infringement—of Telechron. The words, as suggested previously, have a similarity in spelling and sound. The marks have similarity in appearance whether in script or some other style. Of course, "The infringer rarely has the hardihood to make a Chinese copy"; [108] and "Of course, few would be stupid enough to make exact copies of another's mark" [109] because "Similarity, not identity, is the usual recourse when one party seeks to benefit himself by the good name of another." [110] The proof in these cases is likelihood of confusion among those who are acting upon their memory of a particular mark.[111] Judge Maris, as a nisi prius judge, observed: "It is equally clear that the granting of relief need not be conditioned upon the showing of actual deception of the public." [112] In a case where the two words approached an absolute identity in sound Judge Learned Hand discussed the importance of likelihood of confusion: "Of course, the burden of proof always rests upon the moving party, but having shown the adoption of a similar trade name, arbitrary in character, I cannot see why speculation as to the chance that it will cause confusion should be at the expense of the man first in the field. He has the right to insist that others in making up their arbitrary names should so certainly keep away from his customers as to raise no question. In the case at bar there is at least ample doubt that this will be true. 'Listogen,' if the accent be on the first syllable, is like enough to 'Listerine' to serve as an apt means of substitution among those who have not already enough familiarity with the plaintiff's article as to be safe from any such efforts. There is always a fringe of possible customers, next year's for instance, with whom such opportunities are not to be disregarded, people who have heard vaguely the old name or seen it in advertisements and who fail to carry it with accuracy in their memory. Among these confusion is eminently possible, and that possibility, if not a remote speculation, is quite enough." [113]

■ I advert to the rules above merely to show the extension of equitable protection. Here, there is, beyond likelihood of confusion, the *fact* of confusion and deception already occurred. Absent a test as to what is calculated to deceive, the realistic test is whether, under the particular set of circumstances, the competing product has actually confused and deceived.[114] The recitation of the facts, as narrated, show the instances of outright confusion among purchasers. There was confusion likewise among the various sales-clerks, for the evidence indicates the clerks themselves were confused by the similarity of the marks Telicon and Telechron. Confusion among clerks is in itself enough to establish infringement because "it is certain that if clerks who sell a product are confused to the point of selling one article for another such is evidence of the probability of confusion by customers." [115]

108. Enoch Morgan's Sons Co. v. Ward, 7 Cir., 152 F. 690, 693.

109. Baker v. Master Printers Union of N. J., D.C., 34 F.Supp. 808, 811.

110. Celluloid Mfg. Co. v. Cellonite Mfg. Co., C.C., 32 F. 94, 97.

111. Fox Fur Co. v. Fox Fur Co., D.C., 59 F.Supp. 12, followed in Fox Fur Co. v. Fox Fur Co., D.C.Del., 59 F.Supp. 701, 703.

112. Great Atlantic & Pacific Tea Co. v. A. & P. Radio Stores, Inc., D.C., 20 F.Supp. 703, 705.

113. Lambert Pharmacal Co. v. Bolton Chemical Corp., D.C., 219 F. 325, 326.

114. Photoplay Pub. Co. v. La Verne Pub. Co., 3 Cir., 269 F. 730, 733.

115. S. S. Kresge Co. v. Winget Kickernick Co., 8 Cir., 96 F.2d 978, 987.
By way of aside, it is suggested if the clerks in the instant case were not confused, they took advantage of similarity and the apparent customer confusion. Smith (Davega Stores), a defense witness, in explaining an incident of confusion on the part of an inquiring customer, said: "They get a customer in the booth, and you can't be in there with him, and salesmen are sharp; they work for salary and commission; they want to sell as much as they can. If this salesman thought this man thought it was the Telechron, the same company, he would say yes. How are you going to stop that? It was nothing of our doing, and things like that happen, and much worse. That is probably just what

## Unfair Competition

■ 1. In this case all the products of the parties are not identical; but they are related. This does not mean that all relief should be denied plaintiff; on the contrary, relief may be had when goods, though different, are so related as to fall within the mischief which equity should prevent. In fact, our Court of Appeals has said: "The applicable law on the issue of unfair competition is briefly this: There was at one time a rule of law, on which the defendants stand and at which they stop, to the effect that there can be no unfair competition unless there is actual competition of some kind. Borden Ice Cream Co. v. Borden's Condensed Milk Co., 7 Cir., 201 F. 510. But the law since then has taken a step onward. Unfair competition may exist not alone in the sale of goods of the same character but in the unfair appropriation and use of the trade name of another with the intention, of course, thereby to profit in the sale of goods either of a related character or that suggest the origin of the name appropriated. Such an act is not an infringement of a trade-mark, as a trade name, not a trade-mark, is there involved, but it is a trespass of the same nature as that committed by a man who applies another man's name to his own goods. And it is a wrong which equity will enjoin even where the goods of the two men do not enter into competition." [116]

■ In this District, Judge Morris discussed one of the controlling rules, applicable to the case at bar, when he said: "That branch of the law to which has been given the name 'unfair competition' has not developed along rigid or narrow lines. It affords relief wherever, by reason of an unjustifiable act, the goods of one party to the suit will probably be accepted by the purchasing public as the goods of another, for by such act the good will of the latter is put, to the latter's injury, at the mercy of the former.

"The goods capable of being so passed off are not limited to those that are identical or even to those that have the same descriptive properties. Many articles, quite dissimilar in their appearance, properties, and use, may nevertheless bear such relation to each other and be so associated in the mind of the public that confusion and deception touching their respective origins will follow as a natural consequence, if their dress or marks are similar." [117]

■ So, too, Judge Learned Hand has said: [118] "It is now well settled in this

happened in that case. If he had gotten another salesman who was a little more on the level, who knew what he was talking about, as this fellow probably did, but figuring that the customer would be more impressed if it was Telechron, he says Telechron. He had no business to do it."

The instrument of fraud rule applies to trade-mark infringement. The leading American case of Von Mumm v. Frash, C.C., 56 F. 830, explores the rule. The English authorities have recognized it: "No man has a right to adopt and use so much of his rival's established trade-mark as will enable any dishonest trader, into whose hands his own goods may come, to sell them as the goods of his rival." Johnson v. Ewing, L. R. 7 App.Cas. 219; and Manufacturing Co. v. Loog, 18 Ch.Div. 412; "No man is permitted to use any mark, stars, or any other means whereby, without making a direct false representation himself to a person who purchases from him, he enables such purchaser to tell a lie, or make

a false impression, to somebody else, who is the ultimate customer."

Mr. Justice Brandeis restated the rule: "The honest manufacturer's business may suffer, not merely through a competitor's deceiving his direct customer, the retailer, but also through the competitor's putting into the hands of the retailer an unlawful instrument, which enables the retailer to increase his own sales of the dishonest goods, thereby lessening the market for the honest product. That a person is a wrongdoer who so furnishes another with the means of consummating a fraud has long been a part of the law of unfair competition." Federal Trade Commission v. Winsted Hosiery Co., 258 U.S. 483, 494, 42 S.Ct. 384, 386, 66 L.Ed. 729.

116. Kotabs, Inc. v. Kotex Co., 3 Cir., 50 F.2d 810, 812, 813.

117. Wm. A. Rogers, Ltd. v. Majestic Products Corp., D.C.Del., 23 F.2d 219, 220.

118. L. E. Waterman Co. v. Gordon, 2 Cir., 72 F.2d 272, 273.

country that a trade-mark protects the owner against not only its use upon the articles to which he has applied it, but upon such other goods as might naturally be supposed to come from him. \* \* \* The theory on which the wrong has been extended to include the use of the mark on goods never made or sold by the owner, is that, though the infringer's user cannot at the moment take away his customers, it may indirectly do so by tarnishing his reputation, or it may prevent him from extending his trade to the goods on which the infringer is using the mark. That would seem as much a violation of the interest which the mark serves to protect, as though it was used upon the same kind of goods as the owner sells. That interest is that he shall be secure in the meaning of the mark to those who wish to deal with him."

Under the theory of these cases, clearly the use of Telicon as a trade-mark is unfair.

2. Another phase of defendant's activity constitutes a facet of its unfair competition, i. e., the use of Telicon as defendant's corporate name. Telicon Corporation is improperly similar to Telechron, Inc., as a corporate name. The plaintiff had Telechron for its mark and it is the predominant word in its corporate name; and both its products and its business have been generally known by the use of the word Telechron. Under such circumstances, it is entitled to protection from the junior party when it attempts to enter an allied field. Mr. Justice Sutherland observed [119] that: "The general doctrine is that equity not only will enjoin the appropriation and use of a trade-mark or trade-name, where it is completely identical with the name of the corporation, but will enjoin such appropriation and use where the resemblance is so close as to be likely to produce confusion as to such identity, to the injury of the corporation to which the name belongs. \* \* \* There may be, of course, instances where a single word in the corporate name has become so identified with the particular corporation that, whenever used, it designates

to the minds of the public that particular corporation. \* \* \*"

Here, Telechron has been the mark for plaintiff's products and the emphatic word in its corporate title. It has been the trade name by which plaintiff and its business were familiarly known for years before defendant adopted Telicon as its mark and as its corporate name for similar purposes.

The subject of such rights was considered in Standard Oil Co. of New Mexico v. Standard Oil Co. of California, 10 Cir., 56 F.2d 973, 977, 978:

"Generally speaking, a trade-mark is applicable to the vendible commodity to which it is affixed, and a trade name to a business and its good-will. \* \* \*

"The general purpose of the law of unfair competition is to prevent one person from passing off his goods or his business as the goods or business of another. \* \*

"A business institution by handling only goods of high quality, by fair dealing, by judicious and honest advertising, by skillful management, and by prompt payment of its financial obligations over a period of years will establish a business reputation or good-will which, though intangible, is of great value and is entitled to protection the same as any other property right.

"A corporation may establish its corporate name as a trade name; it may build up a fine reputation for the high quality of its products, for financial responsibility, and for business integrity and fair dealing in the field within which it transacts its business. When another corporation enters that field for the purpose of engaging in a similar business and appropriates the same name or one so similar as to cause confusion in the minds of the public, its ability to injure the senior corporation is not limited solely to competition in the sale of its products. Any act committed by the junior corporation which would cause damage to the credit, or reputation for integrity and fair dealing of the senior corporation, if committed by the latter, would injure it if the public, because of the similarity of the

119. American Steel Foundries v. Robertson, 269 U.S. 372, 381, 46 S.Ct. 160, 162, 70 L. Ed. 317.

names, should attribute such act to the senior corporation.

\*    \*    \*    \*    \*    \*

"A corporate name or trade name identifies a corporation; it also identifies its business and the goods or services which it sells or renders. If a junior corporation appropriates such name or a name so similar thereto as to lead to confusion, it appropriates the reputation that goes with it and removes that reputation beyond the power of the owner to protect. Unless the junior's business is so foreign to the senior's as to insure against the public confusing the two, it is unlawful. Yale Electric Corp. v. Robertson, 2 Cir., 26 F.2d 972; Del Monte Special Food Co. v. California Packing Corp., 9 Cir., 34 F.2d 774; Certain-Teed Products Corp. v. Philadelphia & Suburban Mortg. Guarantee Co., 3 Cir., 49 F.2d 114; and cases cited note 1, infra.

"There was a time in the history of the law of unfair competition when it was a debatable question whether a merchant's good-will indicated by his trade name or trade-mark extended beyond such goods as he sold (Yale Elec. Corp. v. Robertson 2 Cir., 26 F.2d 972–973), but it is now well settled that the law of unfair competition is not confined to cases of actual market competition. If one fraudulently sells his goods or his services or his securities as those of another, injury may result to the latter although he is not engaged in the manufacture or sale of like goods. Where one passes off his goods, his services, or his business as the goods, services, or business of another, equity will intervene to protect the good-will and business reputation of the latter from any injury liable to be caused thereby."

A case of unfair competition, involving the use of corporate name, arose in the Delaware state courts, where the facts showed a confusion in close parallel to the case at bar. In that case [120] Chancellor Wolcott said: "The next question is—does the defendant's name bear such resemblance to the complainant's name as to lead the public to confuse the identity of the two?

The evidence shows that it does. It discloses that there has been some confusion of mail, the police department of Philadelphia has taxed the complainant with littering the streets with advertising circulars which bore the defendant's name, complaints have been made to the complainant of dissatisfaction with the quality of goods sold by it which were in fact sold by the defendant's subsidiary, and the complainant's credit with one supply house was withdrawn for a period of time because of the belief that the complainant had become a part of the defendant's chain. These circumstances are enough to show that the public confuses the identities of the complainant and defendant. Where such confusion exists, it is but reasonable to expect that the complainant's trade will be adversely affected.

"But damage to sales is not the only sort of injury which courts will consider in determining whether an injunction should issue against the use by a defendant of a name which confuses its identity with the complainant. In Akron-Overland Tire Co. v. Willys-Overland Co. 273 F. 674 (11 T.M. Rep. 281), the Circuit Court of Appeals Third Circuit, sustained the action of the lower court [Delaware U. S. District Court] in enjoining the defendant from using the word 'Overland,' notwithstanding the business of the appellant was that of selling automobile tires while that of the appellee was the manufacture and sale of automobiles, two businesses that were in no wise competitive. The court took the view that the appellee was entitled to be free from the possible danger to its reputation and credit which would result by the public's confusion of the identity of the appellant with the appellee and the consequent holding by third parties of the appellee to be accountable for the appellant's acts. A similar situation is shown to have existed in the instant case, for on at least one occasion the complainant has been rather severely taken to task by a purchaser of a radio set which was said to be inferior in quality and which had been sold not by the complainant but by the defendant. How much

120. American Radio Stores v. American Radio & Television Stores Corporation, 17 Del. Ch. 127, 150 A. 181, 182.

such adverse criticism of the quality of the complainant's articles has been engendered by the confusion of the complainant's identity with the defendant's, it is impossible to say. If some of it has been voiced to the complainant, it is not unreasonable to conclude that considerable of it has been either silently entertained or perhaps spread around amongst acquaintances. In either case the criticism is a source of injury.

"Wall v. Rolls-Royce of America, 3 Cir., 4 F.2d 333 (15 T.M.Rep. 239), was similar in principle to the case just cited and was to the like effect. In that case the two businesses were noncompetitive. But the court said that just as the appellant could benefit by using the distinctive word in the appellee's well known and highly honorable name, conversely the appellee could and doubtless would be injured by having its goodwill and fair name detracted from by the appellant's use of the word.

"It is true that in the cases just referred to the view was justified that there was an express intent on the part of the defendant to make a wrongful use of the name, and here no evidence of such express intent is shown. But evidence is disclosed of harmful results to the complainant in fact, and it is reasonable to suppose that if results of that kind have occurred in the past they will continue into the future. Where that is the case it is not necessary for the complainant to show an express intent and design on the part of the defendant to injure the complainant's trade. * * *".

█ 3. I shall not pause to decide whether the record in the case at bar contains evidence of original intent on defendant's part in adopting Telicon to copy plaintiff's use of Telechron. However, defendant persisted after notice of plaintiff's assertion of its rights. Defendant at that time made no decision to change. After January 1946, it deliberately expanded the use of Telicon to radios and television sets. Continued use of a mark after challenge may block a defense against deliberate imitation.[121]

This is the case which occurred at trial. Facts were established, in my opinion, to show both trade-mark infringement and unfair competition. Confusion, mistake and deception occurred in connection with defendant's use of the word Telicon. Under this facet of the litigation, plaintiff would be entitled to equitable relief. But, as stated before, after the trial closed, defendant applied to reopen the case in order to adduce further evidence. The effect of the new evidence and defendant's latest theory of its case must be considered and decided.

### The Case as Reopened

Defendant moved to reopen the case, after trial, for the introduction by it of evidence which it claimed would show plaintiff's mark "was adopted as the identifying and generic name" of a patented device.

At the second-trial plaintiff reviewed certain of the old facts and urged additional new facts in support of its position. Emphasizing the facts already in the record, defendant pointed out that the Warren Clock Company was originally in the business of manufacturing battery-driven clocks —sold as Warren Clocks. In 1916, Henry Warren, president and founder, invented a self-starting synchronous electric clock upon which he obtained four patents in 1918 covering the device and and its component mechanisms.[122] Later, Warren selected the name Telechron, which combined the terms "tele" and "chron" to designate this new type of time indicator and from then on the name Telechron was imprinted on the face of each clock.[123] In 1921, Telechron was registered as a trade-mark.[124] In 1923, Telechron was again registered, and this time for application to motors. Defendant refers to the fact that plaintiff's own advertising describes the Telechron products as a new type of time-keeping device and the greatest improvement since

121. G. H. Mumm Champagne v. Eastern Wine Corp., 2 Cir., 142 F.2d 499, 501, 502, Judge Learned Hand, certiorari denied 323 U.S. 715, 65 S.Ct. 41, 89 L.Ed. 575; Queen Mfg. Co. v. Isaac Ginsberg & Bros., Inc., 8 Cir., 25 F.2d 284, 288.

122. Tr. pp. 344–5; DX. 39, 40 and 83.

123. Tr. p. 362; DX. 81, 35.

124. PX. 25; DX. 41.

1700;[125] the Encyclopedia Britannica defines Telechron in the same fashion as contained in plaintiff's advertising material;[126] and other technical publications similarly define Telechron.[127] Defendant claims the testimony shows "electric clock" applies to all clocks activated by electricity,[128] whereas a Telechron clock is a special type of electric clock "decidedly different from any other clock",[129] and first motivated by a self-starting synchronous motor in this country.[130]

In 1917 General Electric acquired a 50% interest in the Warren Clock Company and by 1943 it owned 100% of the plaintiff's stock.[131] By agreement, the motor field was in the province of General Electric and the clock field exclusively with Telechron.[132] The plaintiff enjoyed its patents with no competitors prior to 1926, after which non-self-starting synchronous clocks came on the market and infringers appeared. Infringement litigation brought about license agreements so that in 1935 only three infringers remained—Waltham, Western and Seth-Thomas.

The point of defendant's factual reference is clear. However, the crux of its latest defense is that as descriptive words are not validly registrable as trade-marks, Telicon is not an infringement of Telechron. On this basis, defendant contends even at the time of adoption and registration, Telechron was a term descriptive of a product of plaintiff and it was so introduced to the public by plaintiff. Reference, defendant says, to standard English dictionaries shows that "tele" is defined in the same manner by all lexicographers; it appears by definition to be a combination derived from classical Greek having the English meaning "far", "far-off", "distant" and "remote"; with respect to applications, it appears the word is commonly used to designate electrical devices from a distance or remotely activated by the transmission of electrical impulses; and the dictionary describes the operation of electrical synchronization employed in the field of electrical application where there is a combination formed of "tele" used as a prefix to the dictionary name of various devices—for example, the prefix is used to name electrical instruments for measuring, i. e., telehydrometer, telemeter, telemetrograph; for recording—teleanemograph, telebarograph, telebarometer, telemanometer, telemeteorograph; for communication—telegraph, telephone, telecrystograph, teletypewriter; for object, image and facsimile reproduction—teleiconograph, teleautograph, telechirograph, telegraphoscope, telemetrograph, telectroscope, telephoto, televisor.

Thus, defendant argues, Telechron is a combination of "tele" and "chron" and is simply descriptive of any electric clock. More than that, it aptly describes synchronous motored electric clocks and synchronous electric time indicating, measuring and recording devices, as well as their component elements of a synchronous clock. The record establishes, defendant contends, when Telechron was first used as a trademark in 1919, and from then on, it was used only for alternating current synchronous motored electric clocks under the Warren patents; and plaintiff itself introduced its clock to the consumer public as being synonymous with and descriptive of its newly invented time indicating devices. Defendant points to the long array of plaintiff's advertising material to support the statement; and argues as of the time of adoption and registration, Telechron, at the utmost, was a term suggestive of the product of plaintiff. Defendant points out that the origin of manufacture denoted by the mark Telechron in its usual script form on the face of defendant's clock is to that clock alone.

Defendant contends before there can be any consideration whether unfair competition has been made out, it is necessary first to determine whether plaintiff has established secondary meaning. Defend-

125. DX. 48.
126. DX. 1.
127. DX. 565–6.
128. Tr. p. 487.

129. Tr. p. 410.
130. Tr. p. 395.
131. Tr. p. 45; DX. 81.
132. Tr. p. 48; DX. 38.

19

ant relies on the two leading cases which have held that one claiming secondary meaning for a descriptive mark has the burden of proving such mark has come to unqualifiedly denote to the consumer public that the product to which it is applied originates from the complainant: Kellogg Co. v. National Biscuit Co., 305 U.S. 111, 118, 119, 59 S.Ct. 109, 83 L.Ed. 73; Canadian Shredded Wheat Co., Ltd. v. Kellogg Company of Canada, Ltd. (Privy Council, 1938), 55 R.P.C. 125.[133]

■ Defendant's final point is under the teachings of the cases Telechron was a word free for any public usage long before defendant adopted Telicon as its mark and corporate name; hence, such use by defendant can amount to neither trade-mark infringement nor unfair competition. The fact that plaintiff's mark was applied to a patented product, it is claimed, does not change the general rule and thereby give monopolistic power of exclusion even for the period of the life of the patent, for patents do not carry with them a grant of exclusive user of the marks applied to the things patented along with the grant of exclusive right to make the patented things.[134] Plaintiff, defendant charges, instructed the public as to the suggestive nature of the mark's word, generically used the word Telechron, and constantly impressed on the public that the mark was being used for the product of the invention of Warren, the founder and president; and that such secondary meaning can never be established with respect to marks descriptive of pat-

ented products when adopted. Canadian Shredded Wheat Co., Ltd. v. Kellogg Co. of Canada, Ltd., supra.[135] It is the teachings, defendant says, of the Singer, infra, and Kellogg cases that it is conclusively presumed that any trade-mark applied to a patented product becomes and remains a term descriptive of such product during the life of the patent; and this, defendant urges, is a conclusive presumption derived from judicial recognition of compelling public policy. Defendant calls for the application of Singer Mfg. Co. v. June Mfg. Co., 163 U.S. 169, 16 S.Ct. 1002, 41 L.Ed. 118, that as a matter of law, upon expiration of the patent any descriptive mark applied to the product of the patent passes into the public domain as the descriptive name of the patented product and that, even if during the life of the patent the owner had a trade-mark right of exclusive user, upon expiry he ceases to have such right and thereafter has no greater rights than any other adopter for a mark of a descriptive term from the common language.[136]

To this new portion of the case, plaintiff raised a caveat. In asserting that the mark Telechron is (1) descriptive; (2) suggestive; (3) weak; and (4) generic, defendant has jumbled these words with indiscrimination and sometimes synonymously, plaintiff argues.

The Special Issue Raised by Defendant on The Case as Reopened.

■ 1. It would appear Telechron meets the test of validity for a trade-mark.

133. Other cases recognizing the rule are: Beneficial Industrial Loan Corp. v. Allenstein, 5 Cir., 173 F.2d 38; Wilhartz v. Turco Products, Inc., 7 Cir., 164 F.2d 731; Skinner Mfg. Co. v. Kellogg Sales Co., D.C., 52 F.Supp. 432; affirmed 8 Cir., 143 F.2d 895, certiorari denied 323 U.S. 766, 65 S.Ct. 110, 89 L.Ed. 613; Steem-Electric Corp. v. Herzfeld-Philippson Co., 7 Cir., 118 F.2d 122, 125, 126; McGraw-Hill Publishing Co. v. American Aviation Associates, 73 App.D. C. 131, 117 F.2d 293; Dryice Corp. v. Louisiana Dry Ice Corp., 5 Cir., 54 F.2d 882, certiorari denied 286 U.S. 558, 52 S. Ct. 640, 76 L.Ed. 1291; Kellogg Toasted Corn Flake Co. v. Quaker Oats Co., 6 Cir., 235 F. 657.

134. Seeger Refrigerator Co. v. White Enamel Refrigerator Co., C.C., 178 F. 567; Seeger Refrigerator Co. v. Parks, C.C., 178 F. 283.

135. In this connection, Judge Woolsey has said: "Patentees may not properly attempt to immortalize their patents by the use of trade-marks or counts in unfair competition." Corning Glass Works v. Pasmantier, D.C., 30 F.Supp. 477, 481.

136. On this point, defendant relies on two cases in our Court of Appeals: Amiesite Asphalt Co. v. Interstate Amiesite Co., 3 Cir., 72 F.2d 946, and Yale & Towne Mfg. Co. v. Ford, 3 Cir., 203 F. 707.

Marks are 1. coined, 2. created by common words in an arbitrary sense, or 3. by acquisition of secondary meaning for words which are descriptive, geographical or surnames in their primary meaning. No difference exists between a new word arbitrarily coined for use as a mark and an existing word having a known meaning but adopted for trade-mark use in a non-descriptive significance. Words used in an "arbitrary sense" have assumed many connotations;[137] while "coined" words are invented trade-marks.[138] Words making up such marks at times suggest an attribute of the products to which they are attached. The quality of being "suggestive" does not condemn their validity as trade-marks. The distinction to be watched is the difference between a descriptive term and a suggestive trade-mark. The suggestive mark intimates a fact; a descriptive word denotes a particular characteristic.[139]

Thus, at the time Telechron was adopted by plaintiff it was not the generic name of any object, nor did it describe anything. Its course of adoption was first as a mark for electric clocks, then it took over synchronous motors, timing devices, selectors used on radios and radios proper. The products themselves all had generic names before the mark Telechron was applied to them. The generic names still exist today, e. g., electric clocks, synchronous motors, timers, selectors, radios. Throughout the long history of plaintiff's manufacture, its competitors selling similar devices have never attempted to use the mark Telechron to identify any of their particular products. Plaintiff answers the defendant's charge that Telechron is a "weak" mark by demonstrating that a weak mark is one used to suggest quality or grade, such as "Gold Medal", "Blue Ribbon", or "Royal". Telechron contains no connotation of either quality or grade. It has been applied to a variety of plaintiff's products; has been used exclusively by plaintiff over a long period of years. Its long life and commercial success has demonstrated its strength in the market place.

2. My reading in the literature has covered hundreds of cases dealing with many subjects pertaining to trade-mark infringement and unfair competition. The experts in the field have been hard put to work out a scheme among the multiple decisions. Instance after instance may be cited where decisional results are patently incompatible. A pattern of logic has failed to result, I believe, because each decision is controlled by its particular facts. This type of litigation presents fact cases. This makes it difficult to apply precedents which are conclusive. The soundness of any particular court's decision is controlled by the fidelity of the application of established

137. Beau Brummel—haberdashery: Weisbaum Brothers-Brower Co. v. Irving Brandt & Company, Inc., 34 U.S.P.Q. 40; Eagle—snuff: De Voe Snuff Co. v. Wolff, 6 Cir., 206 F. 420; Lightning—hay knives: Hiram Holt Co. v. Wadsworth, C.C., 41 F. 34; Tea Rose—flour: Hanover Star Mill Co. v. Metcalf, 240 U.S. 403, 36 S.Ct. 357, 60 L.Ed. 713; White House—coffee: Dwinell-Wright Co. v. Co-operative Supply Co., C.C., 148 F. 242; Fashion Park—men's clothing: Rosenberg Bros. & Co. v. Elliott, 3 Cir., 7 F.2d 962.

138. Argyrol—antiseptic: Barnes v. Pierce, C.C., 164 F. 213; Cedarine—furniture polish: Allen v. Walker & Gibson, D.C., 235 F. 230; Tetterine—tetter remedy: Shuptrine Co. v. Eucaline Medicene Co., D.C., 40 F.2d 303; Zephyrlite—flashlight: Scovill Mfg. Co. v. United States Electric Mfg. Corp., D.C., 31 F.Supp. 115, 120; Suavelle—satin-face silk fabric: Pocono Rubber Cloth Co. v. J. A. Livingston, Inc., 3 Cir., 79 F.2d 446.

139. In Selchow v. Baker, 93 N.Y. 59, 64, the mark Sliced Animals was held valid because suggestive, but not descriptive, of animal picture puzzles. The same test was applied in Sleight Metallic Ink Co. v. Marks, D.C., 52 F.2d 664, and the mark Metallic was held invalid because it was a necessary description of inks which had a metallic luster. The descriptive word Metallic states both color and composition of a particular product. Likewise, a generic term identifies a product by its basic name. Scrapple, cereal, etc., are semantically known as generic terms for the objects they identify. They can not be valid trade-marks for such objects because they are used to identify the *objects*. The essential function of a trade-mark is to identify the *source* of the product.

legal principles to a particular set of facts for adjudication.[140] The area of trade-mark protection has been recently treated by Judge Clark in La Touraine Coffee Co., Inc. v. Lorraine Coffee Co., Inc., 2 Cir., 157 F.2d 115, certiorari denied 329 U.S. 771, 67 S.Ct. 189, 91 L.Ed. 663, and in Judge Frank's challenging dissent in that case.

■■■ Defendant, here attempts to place a burden on plaintiff that the mark is descriptive or "if deemed registrable as a suggestive mark" it is not infringed by Telicon for plaintiff has not met the factual burden of proof of secondary meaning and deceptive intent. Where the mark is arbitrary there is no such burden. Moreover, the record is clear Telechron connotes source of product with plaintiff. The evidence and the extent of the proofs are replete connecting the mark with the products and the general public familiarity with Telechron and its use.[141] As to deceptive intent, there was no burden on plaintiff for such proof where the mark is validly registered. Intent, here, is of no moment.[142] Where adoption and use of a registered arbitrary mark has been established and confusing similarity of a defendant's mark on goods of the same class have been demonstrated, plaintiff's burden of proof has been fully discharged. As to the charge of unfair competition, defendant had the right to justify its adoption of the similar mark by way of defense in avoidance; but

it has not met this burden. On the contrary, there are facts to show intent to infringe and to compete unfairly.

3. Defendant's main defense, upon the reopening, was that Telechron has passed into the public domain. It states its theory: "However, the teachings of the Singer and Kellogg cases is that it is conclusively presumed, and therefore is a matter of law, that any trade-mark applied to patented product became and remained a term descriptive of such product during the life of the patent * * * The doctrine of the case of Singer Mfg. Co. v. June Mfg. Co., 1896, 163 U.S. 169, 16 S.Ct. 1002, 41 L.Ed. 118, is that as a matter of law, upon expiration of the patent any mark applied to the product of the patent passes into the public domain as the descriptive name of the patented product; * * *"

This view is that, "as a matter of law" even if a trade-mark during the life of a patent and after expiration identified the maker or source of a product, still the fact there was a patent on a product, to which the mark was affixed, is sufficient to pass the mark into the public domain—make it a generic term, regardless of whether it had ever acquired a generic meaning.

■■■ I can not agree defendant's postulate is a correct statement of the law. Whether or not a mark applied to a patented product becomes generic and passes into the

140. Premier Malt Products Co. v. Kasser, 3 Cir., 26 F.2d 1021; Stephano Brothers, Inc. v. Stamatopoulos, 2 Cir., 238 F. 89, 94, L.R.A.1917C, 1157; Glenmore Distilleries Co. v. National Distillers Products Corp., D.C., 23 F.Supp. 928, 931, affirmed 4 Cir., 101 F.2d 479.

141. E. g., 1090 advertisements by 26 electric clock manufacturers over 20 years, (1929–49) which show 85 typical advertisements that competitors had never made reference to Telechron in connection with the sale of their products, except two manufacturers who used the mark to indicate their clocks contained motors of plaintiff.

142. "Guilty knowledge or fraudulent intent is not an essential element of infringement of such a mark. It is well settled that an infringement will be re-

strained irrespective of the question of intent on the part of the infringer. Saxlehner v. Siegel-Cooper Co., 179 U. S. 42, 43, 21 S.Ct. 16, 45 L.Ed. 77. This is based upon the ground that the original proprietor has a qualified property right in the trade-mark, of which the pirate has made unlawful use.

"The right to an injunction is not made to depend upon the fact that deception was either intended or practiced. If the opportunity is furnished where deception may ensue, a basis exists to grant injunctive relief. Lawrence Mfg. Co. v. Tennessee Mfg. Company, 138 U.S. 537, 11 S.Ct. 396, 34 L.Ed. 997 [Lawrence Mfg. Co. v. Janesville Cotton-Mills, 138 U.S. 552, 11 S.Ct. 402, 34 L.Ed. 1005]." Mishawaka Rubber & Woolen Mfg. Co. v. S. S. Kresge Co., 6 Cir., 119 F.2d 316, 323.

public domain appears to be a question of fact, not of law.[143]

While defendant states Warren obtained four patents, the record shows plaintiff held many more, covering numerous articles on parts and improvements. The usual practice was for plaintiff to reproduce its mark on its products as the trade-mark signature on its advertising. The mark was first devised and used in 1919; and subsequently, throughout the life of the patents and since, plaintiff has manufactured many designs of electric clocks, motors, selectors and timers; it has applied the mark to all of these, including radios. Such use served the purpose of identifying the goods for source. Throughout this time, as one witness testified, there was an "epidemic" of other manufacturers of similar products. No competitor used the mark Telechron to identify his products. The record is bare of any evidence competitors had the need of using the word or were restricted in the sale of their particular products by their inability to use it. In fact, competitors' testimony indicates the contrary. They recognized the mark as plaintiff's.[144]

143. Handler and Pickett, "Trade-Marks and Trade Names", 30 Col.Law Rev. 168, 187:

"It must not be forgotten, however, that there is no rule of law that the name of a patented article becomes generic upon the expiration of the patent. There is not even a presumption that the name becomes publici juris. Whether or not it does is purely a question of fact."

144. W. Kenneth Sessions, President of the Sessions Clock Company, having been connected with the business since 1917 and having succeeded his father who had founded the business, and thus having had a long and wide knowledge of the clock field, testified (Tr. pp. 540–41):

"Q. Now, I believe you have told me, sir, that you took the presidency of your company in 1920 and went there in 1917, which is about thirty-three years ago. I want to ask you whether or not to your knowledge any clock manufacturer other than the Telechron, Inc. and its predecessors ever used in connection with the manufacture of a clock the term 'Telechron'? A. Not to my knowledge.

"Q. I will ask you the same question with respect to motors and timers, whether or not any other manufacturer, any manufacturer other than Telechron, Inc. and its predecessors, ever used the term 'Telechron'? A. I never saw them.

"Q. Out of this long experience in the clock business, Mr. Sessions, may I ask you whether or not 'Telechron' is considered by the manufacturing and dealing trade as the trade-mark of the Telechron, Inc. and its predecessors? A. I believe it is universally considered the trade name—trade-mark."

On cross-examination, Mr. Sessions testified (Tr. p. 568):

"Q. All right, Mr. Sessions, will you tell us what the word 'Telechron' means to you, and I understand you to be a clock manufacturer of many years standing? A. Mostly it meant competition."

Arthur W. Haydon, with twenty years' experience in the manufacture and distribution of motors, testified (Tr. pp. 578–79):

"Q. Now, I want to ask you, sir, whether to your knowledge any other company or person than the Telechron, Inc. and its predecessors have ever used the term 'Telechron' in connection with motors? A. Definitely not. The trade name 'Telechron' was recognized as a trade-mark of the Telechron Company.

"Q. I will ask you the same question with respect to electric clocks. To your knowledge has anybody else ever used that term? A. Only in a situation where the company purchased the Telechron motor, and even those parts were sold under the trade name of the respective company, such as Herchede. There are two or three others.

"Q. Finally, I ask you whether or not 'Telechron' is generally recognized by the motor and clock industry as the trade-mark of the Telechron, Inc.? A. Definitely."

On cross examination, he testified: (Tr. p. 586):

"Q. What does the word 'Telechron' mean to you, sir? A. It is the trade-mark of the Telechron Company.

"Q. It means nothing more than a trade-mark? A. No. It identifies the source, the same as 'Haydon' identifies products of ours.

"Q. Aside from source doesn't it identify type? A. Definitely not, because they make—the Telechron Company has a number of products—clocks, motors, timers.

"Q. Don't you know, Mr. Haydon, that there is only one type of Warren motor? A. I know that there are several types."

█ It is difficult to see how Telechron has become a generic term. It has been used on numerous articles. It can not be said to be generic for electric clocks, for synchronous motors, range timers, radio clock timers, selectors or radios. It is not generic for all these products, nor would it appear to be generic for any one. So, too, it could not be generic for defendant's related products such as crystals, radios or television sets.

I can not agree that the defense in the case at bar is impregnable under Kellogg Co. v. National Biscuit Co., 3 Cir., 91 F.2d 150; Id., 3 Cir., 96 F.2d 873; Id., 305 U.S. 111, 59 S.Ct. 109, 83 L.Ed. 73 and Singer Mfg. Co. v. June Mfg. Co., C.C., 41 F. 208; Id., 163 U.S. 169, 16 S.Ct. 1002, 41 L.Ed. 118. Here, again, it is necessary to examine the fact situation in Kellogg before applying its teaching. Kellogg did nothing more than determine, as a matter of fact, the term "Shredded Wheat" had always been generic and descriptive of the product.[145] The English authority held to the same effect in the Canadian Shredded Wheat Co., Ltd. v. Kellogg Co. of Canada, Ltd., heard before the Judicial Committee of the Privy Council on appeal from the Court of Appeal for Ontario, Canada, 55 R.P.C. 125.[146] In Kellogg, the patents were basically for the product and the process of making it as well as the machinery used in the manufacture. In the patents themselves the word "shredded" was constantly used as descriptive. Beyond the patents themselves, the factual record demonstrated beyond doubt that the material and manner of use

of the word was both generic and descriptive. The preponderant proof was that "Shredded Wheat" was understood by the trade and public to describe the product. The testimony came from a variety of witnesses throughout the United States, e. g., wholesale and retail grocers, a demonstrator, salesmen, restaurant dealers, housewives and individual consumers. Kellogg is no analogue to the case at bar.

This applies to the Singer case also. The Court at no place suggested that "Singer" became generic because of the patents or the expiration of the patents. It did decide that the name had become generic of the product patented, and that it passed to the public with the expiration of the patent. The true doctrine of the Singer case has found its way into the Restatement of the Law of Torts, § 735, Comment (1) (b), that "There is no rule that a trade-mark for a patented article ceases to be a trade-mark on the expiration of the patent," that "it is not by the expiration of the patent or secret, but by the change of meaning in the market, that such a designation ceases to be a trademark," and that "the existence of the patent is simply a circumstance which may facilitate the change of meaning in the market." The factual record in Singer was voluminous. Quantities of evidence show that "Singer" had been used by the patent owner, by its competitors, by the trade, and by the public, to designate the product rather than the source of manufacture; by such use, "Singer" had become generic for sewing machines of a particular class and type.[147]

---

145. "The plaintiff has no exclusive right to the use of the term 'Shredded Wheat' as a trade name. For that is the generic term of the article, which describes it with a fair degree of accuracy; and is the term by which the biscuit in pillow-shaped form is generally known by the public. Since the term is generic, the original maker of the product acquired no exclusive right to use it. As Kellogg Company had the right to make the article, it had, also, the right to use the term by which the public knows it." Mr. Justice Brandeis, 305 U.S. at pages 116, 117, 59 S.Ct. at pages 112, 113, 83 L. Ed. 73.

146. Lord Russell of Killowen wrote: "It must be remembered that shredded wheat was not only the name given by the inventor to a new product which could be baked into a biscuit, but was also descriptive of the product both as to its composition and its appearance."

147. E. g., the evidence showed that many companies used "Singer" as a part of the names of their machines—"Stewart Singer", "Chicago Singer", "Williams Singer", "Canadian Singer", "German Singer", among others. It was on this basis that the Court decided there was "no other possible designation, in the mind of the general public.

154

The Singer doctrine has never been applied where the mark is used in connection with an entire line of products, such as here, for a generic name can only be a name of a particular article. An arbitrary term applied to a whole line of products can not be generic. This distinction has been noted by an expert specialist in the profession. Mr. Nims [148] has written: "A name used on different articles made by the same concern cannot be the generic name for one of these articles, even though that one article once was patented. The name 'Singer' was used on various types of sewing machines, but the Singer machines, as a whole represented a class which became known to the public under that comprehensive name."

### Conclusion

On the factual proofs and applicable law I think the preliminary injunction which I have issued should now be made final, and plaintiff should be given appropriate relief upon the remaining prayers in its complaint. The decree, of course, will be settled on notice.

### Appendix To Opinion

Appendices were filed with defendant's brief. They consist of material not in the record. Appendix A contains excerpts from articles published in 1922 in "Illustrated World" and "Literary Digest". While publication source is identified, authorship is anonymous. There is a discussion of a "little known device known as a 'Telechronometer', which registers accurately the amount of time one talks on the telephone". Appendix A contains a patent history of the device. Appendix C contains a note from the Encyclopedia Britannica on "Telechron", as well as purported references and quotations from other publications. As stated, this material was not in evidence. In any event, its worth as evidence is deficient. It does not show whether the noted device was ever used as a trade-mark or if it had any public connotation. There is no showing of any real commercial existence.

148. Unfair Competition and Trade-Marks (4th Ed.) Vol. 1, pp. 581–82.