A. SMITH BOWMAN DISTILLERY,
INC., Plaintiff,

v.

SCHENLEY DISTILLERS, INC.,
Defendant.

Civ. A. No. 2199.

United States District Court
D. Delaware,
at Wilmington.

July 31, 1961.

H. James Conaway, Jr., Morford, Young & Conaway, Wilmington, Del., and Henry B. Weaver, Jr., Quinn O'Connell, Hershel Shanks and Weaver & Glassie, Washington, D. C., for plaintiff.

Aaron Finger, and Richards, Layton & Finger, Wilmington, Del., and Milton B. Seasonwein, New York City, for defendant.

LEAHY, Senior District Judge.

Plaintiff, who owns the registered trademark "Virginia Gentleman," has used it since 1937 on its four-year-old, 90-proof bourbon whiskey. It brought this action alleging defendant's use on a similar product of the marks "Indiana Gentleman" and "American Gentleman" constituted infringement under 15 U.S. C.A. § 1114,[1] and unfair competition. Plaintiff seeks an injunction against the continued use of these marks[2] and cancellation of defendant's marks.[3] Jurisdiction rests on the grant of 15 U.S.C.A. § 1121 without regard to diversity or jurisdictional amount.[4] Because of the

---

1. 15 U.S.C.A. § 1114:
   "(1) Any person who shall, in commerce, (a) use * * * any * * * colorable imitation of any registered mark in connection with the sale * * * of any goods * * * in connection with which such use is likely to cause confusion or mistake or to deceive purchasers as to the source of origin of such goods * * * shall be liable to a civil action by the registrant for any or all of the remedies hereinafter provided * * *."

2. 15 U.S.C.A. § 1116 authorizes injunctive relief to protect the rights of registered trademark owners.

3. 15 U.S.C.A. § 1119 empowers the district courts in any action involving a registered mark to cancel a mark found by them not to be entitled to registration.

4. Since the same acts are alleged to constitute unfair competition, jurisdiction of

*ad hoc* nature of this type of case, precedents are of less than normal value and a careful review of the relevant facts in the instant case is necessary.[5, 5a]

The Bowman family began distilling bourbon on their Virginia farm in 1935, having selected the name "Virginia Gentleman" in an informal family council. This mark was registered in 1937[6] and republished in 1957. Their bourbon has been in high demand almost from its commercial inception, and in 1943, because of war production requirements, plaintiff found it necessary to begin rationing the supply to its customers.[7] After the war-time restrictions were removed, plaintiff still did not produce enough of its bourbon to satisfy the demand so the rationing system was continued and is still in effect, with many customers having their inventories completely depleted before their next shipment arrives. Although plaintiff's capacity was increased by 50% in 1959, the required four year aging process has not yet permitted any of this extra production to be marketed.[8]

The continuing high demand for plaintiff's product is somewhat surprising in view of its advertising practices; for while its annual expenditure in advertising is substantial,[9] compared to the general industry practice it is almost an insignificant sum.[10]

In building up "Virginia Gentleman's" good will, plaintiff claims to have relied on the premise that "the quality of 'Virginia Gentleman' is its own best advertisement"; word-of-mouth recommendation by satisfied customers; and the social prestige attached to a scarce, carefully produced, discreetly advertised product. The success of this policy is evidenced by the growing demand for the product and the rather frequent gratuitous mention of "Virginia Gentleman" in newspaper columns, national magazines, and contemporary novels.[11]

that aspect of the case is specifically granted by 28 U.S.C.A. § 1338(b). See Old Charter Distillery Co. v. Continental Distilling Corp., D.C.Del., 174 F.Supp. 312, 314.

5. See Old Charter Distillery Co. v. Continental Distilling Corp., supra, note 4, at page 315; Telechron, Inc. v. Telicon Corp., D.C.Del., 97 F.Supp. 131, 150–151, affirmed 3 Cir., 198 F.2d 903; D. J. Bielzoff Prods. Co. v. White Horse Distillers, Ltd., 107 F.2d 583, 586, 27 C.C. P.A. 722.

5a. Plaintiff originally moved for summary judgment which was denied. D.C.Del., 190 F.Supp. 586. The case was then tried to the court with live witnesses, the utilization of depositions, exhibits and proceedings in the Patent Office.

6. T.M.Reg. No. 347,081. Renewed January 14, 1957.

7. The bulk of plaintiff's sales is centered in the Maryland-Virginia-District of Columbia area and surrounding states. Plaintiff sells directly to the state "monopolies" of Virginia, West Virginia, Pennsylvania, North Carolina, Alabama, Ohio, and Montgomery County, Maryland, and to two wholesale distributors for resale to retailers in the "open" states. The *quere* posed in note 5 of A. Smith

Bowman & Sons, Inc. v. Schenley Distillers, Inc., D.C.Del., 190 F.Supp. 586, at page 588, is not present for decision.

8. Further expansion is apparently planned in the near future. The family partnership has recently been incorporated and sold to an independent corporation with plans for development, but members of the Bowman family still maintain substantial interests.

9. Including amounts expended through a distributor, advertising expenses in 1959 totalled $54,839.68 and $58,758.57 in 1958. Some of these ads also covered "Fairfax County" plaintiff's bottled-in-bond bourbon, but this brand accounts for only 10% of total sales.

10. "[I]nstead of allocating $5 to $10 a case to advertising as most distillers do, the Bowmans get along on about 30 cents a case."—quotes from Fortune Magazine (July, 1959) (PX 1).

11. The portions of these materials put in evidence by plaintiff, while dealing with varying levels of the social milieu, all apparently meant to present "Virginia Gentleman" as fashionable, or, in the current jargon of several of the authors, "in."

See, e. g., as exhibits: "A Trip Through Sunset Hill Farm"; article from Fortune Magazine of July 1959 "The

Defendant, one of the largest national distillers, in 1958 bottled and sold two cases of a seven-year-old, 86-proof bourbon labeled "Indiana Gentleman" and two cases of an identical product labeled "American Gentleman." In 1959, these marks were registered without opposition.[12] No further shipments have been made under these marks and no advertising of either brand has been done. Defendant admits it was aware of the "Virginia Gentleman" mark during this period, but claims no discussion of similarity between the marks took place at the time its two marks were selected. Defendant's vice-president testified that the name "Indiana Gentleman" was "just hit upon"—the first word to give a connotation of the state where the bourbon was produced and the second "to tone the thing up" and "designate quality." "American Gentleman" also was "just hit on" as a companion name without the localized connotation of source.

Between November 1958 and April 1960, defendant also applied for registration of the marks "The Virginian," "Mr. Virginia," "Virginia Citizen," and "Virginia Settler." The latter two marks have not yet been admitted to publication; "Mr. Virginia" is now subject to an opposition filed by plaintiff;[13] and "The Virginian" has been denied registration as confusingly similar to plaintiff's mark.[14] Defendant's vice-president testified that these names were chosen as appropriate for use on the products of a Virginia distillery the company was then considering building.

Plaintiff requested that defendant discontinue the use of the marks "Indiana Gentleman" and "American Gentleman" and agree to their cancellation because of their similarity to plaintiff's mark. Defendant refused and this suit was brought.[15]

■ 1. Under the statute, a finding of either actual product confusion or confusion as to the source of the product is sufficient to support a holding of infringement.[16] Plaintiff claims both are proved in this suit. Even though only four cases of defendant's bourbon have been sold, this would seem to be enough to satisfy the statute, for Congress here intended to regulate all it constitutionally could.[17] It is immaterial there is no proof of cus-

---

Bowman Brothers Agreeable Business"; Novels "Zotz!" by Walter Karig p. 197; "Caroline Hicks" by Walter Karig, pp. 69, 388–395; "Dead Drunk" by George Bagby, p. 52; "Tower in the West" by Frank Norris, p. 300; portions of Foreign Service Journal of October 1959, pp. 24–25; unidentified newspaper column "Yours" by a certain Betty Beale; portion of Time Magazine of October 26, 1959, p. 20; Book-of-the-Month Club News of September 1947, portion of the novel "Devil in Bucks County" by Edmund Schiddel, pp. 351, 352, 355; portion of the novel "The Big Secret" by Merle Colby, pp. 181, 296; portion of The New Yorker of January 28, 1956, p. 20.

12. Registration after an *inter partes* proceeding creates a prima facie case of non-infringement for the registered mark. See Aluminum Fabricating Co. of Pittsburgh v. Season-All Window Corp., 2 Cir., 259 F.2d 314, 316. However, a district court is not bound by the finding and may consider anew the facts in each case to determine the issue of confusing similarity. See, e. g., Glenmore Distilleries Co. v. National Distiller Prods., 4 Cir., 101

F.2d 479. *A fortiori*, an *ex parte* proceeding does not preclude this court from reconsidering the issue of confusing similarity.

13. Opposition No. 40,849, April 5, 1961.

14. A. Smith Bowman & Sons, Inc. v. Schenley Distillers, Inc., Opposition No. 39,004, May 8, 1961. Defendant's right to use or register these four names is not in issue in the instant case.

15. Plaintiff is also currently seeking injunctive relief elsewhere against the use of the marks "Kentucky Gentleman" and "Maryland Gentleman" by two defendants wholly unrelated to defendant Schenley here. A. Smith Bowman & Sons, Inc. v. Barton Distilling Co., C.A. No. 3644–59, D.C.D.C. ("Kentucky Gentleman"); A. Smith Bowman & Sons, Inc. v. Montebello Liquors, Inc., C.A. No. 12,-800, D.C.Md. ("Maryland Gentleman").

16. 15 U.S.C.A. § 1114.

17. Commerce is defined for the purposes of the Lanham Act as "all commerce which may lawfully be regulated by Congress." 15 U.S.C.A. § 1127.

tomer confusion actually having occurred in either manner, for the statute reaches the situation where only a potential or likelihood of confusion is shown.[18] The lack of any ineluctable rule to test infringing similarity leaves a trial judge somewhat adrift since "the degree of similarity necessary to constitute infringement is incapable of exact definition * * * All that courts * * * can do is to say that no trader can adopt a trade-mark, so resembling that of another trader, as that ordinary purchasers, buying with ordinary caution, are likely to be misled."[19] Another guideline suggested is that "we are in a field where the tendency of the law 'has been in the direction of enforcing increasingly higher standards of fairness or commercial morality in [the] trade. The tendency still persists.' "[20] Also, where as in the instant case, the products to which the marks in question are applied are virtually identical, the degree of similarity in the marks necessary to support a finding of infringement is less than in the case of dissimilar, non-competing products.[21]

■■ 2. While it is not necessary for the plaintiff to establish the defendant's intent to infringe in order to prevail here,[21a] one element to be considered by the court in deciding whether marks are confusingly similar is whether there is any "conscious imitation" by defendant of plaintiff's mark,[22] whereby defendant "poaches upon the commercial magnetism" of plaintiff's symbol[23] or attempts to "bask in the reflected popularity" of plaintiff's established good will.[24] Defendant's denial here of any consideration of the similarity between its marks

18. Telechron, Inc. v. Telicon Corp., D.C. Del., 97 F.Supp. 131, affirmed 3 Cir., 198 F.2d 903; Century Distilling Co. v. Continental Distilling Corp., D.C.E.D.Pa., 23 F.Supp. 705, affirmed 3 Cir., 106 F.2d 486, certiorari denied 309 U.S. 662, 60 S.Ct. 581, 84 L.Ed. 1010.

19. McLean v. Fleming, 96 U.S. 245, 251, 24 L.Ed. 828; see 1 Nims, Unfair Competition & Trademarks § 221(b) (4th ed. 1947). The higher standard of care expected of purchasers of a high-price product has led in some cases to a test involving a "discriminating purchaser" and not merely an "ordinary purchaser" using "ordinary care." See, e. g., Automatic Electric, Inc. v. North Electric Mfg. Co., 6 Cir., 28 F.2d 979. While "Virginia Gentleman" is a comparativly expensive bourbon, it is a relatively inexpensive commodity when viewed in the spectrum of all consumer goods and, whether purchased by the quart, pint, or drink, does not involve such a large capital outlay that an extraordinary degree of care should be expected of its purchasers.

20. Q-Tips, Inc. v. Johnson & Johnson, 3 Cir., 206 F.2d 144, 145, certiorari denied 346 U.S. 867, 74 S.Ct. 106, 98 L.Ed. 377 (quoting II Restatement, Torts 540). The Second Circuit has adopted a similar approach in such cases. As Judge Swan said in Harold F. Ritchie, Inc. v. Chesebrough-Ponds, Inc., 2 Cir., 281 F. 2d 755, at page 758, "The second comer has the duty to so name and dress his product as to avoid all likelihood of con-

sumers confusing it with the product of the first comer." See also, G. D. Searle & Co. v. Chas. Pfizer & Co., 7 Cir., 265 F.2d 385, 387, certiorari denied 361 U.S. 819, 80 S.Ct. 64, 4 L.Ed.2d 65; American Chicle Co. v. Topps Chewing Gum, Inc., 2 Cir., 208 F.2d 560, 563.

21. See Nims, op. cit. supra note 19, at 221 (d).

21a. Williamson Candy Co. v. Ucanco Candy Co., D.C.Del., 3 F.2d 156, 159; see also, 3 Callman, Unfair Competition and Trademarks, 991–92 (2d ed. 1950).

22. Harold F. Ritchie, Inc. v. Chesebrough-Ponds, Inc., 2 Cir., 281 F.2d 755, 758. In what seems to be a circular manner, the court in this case considered the fact of "conscious imitation" evidence of confusing similarity and then based its finding of "conscious imitation" on the similarity in the names. See Miles Laboratories, Inc. v. Frolich, D.C.S.D.Cal., 195 F.Supp. 256.

23. Mishawaka Rubber & Woolen Mfg. Co. v. S. S. Kresge Co., 316 U.S. 203, 205, 62 S.Ct. 1022, 1024, 86 L.Ed. 1381.

24. Q-Tips, Inc. v. Johnson & Johnson, 3 Cir., 206 F.2d 144, 147, certiorari denied 346 U.S. 867, 74 S.Ct. 106, 98 L.Ed. 377. "The wrong is clearest where there has actually been a trading on another's good will." Flintkote Co. v. Tizer, 3 Cir., 266 F.2d 849, 850; see Frankfort Distilleries, Inc. v. Kasko Distillers Prods. Corp., 111 F.2d 481, 27 CCPA 1189.

and plaintiff's is effectively contradicted by the course of action it adopted. Its behavior pattern shows that over a period of less than two years it attempted to register six marks, each with some substantial similarity to "Virginia Gentleman." During this time, plaintiff could not supply the growing demand for its product despite increased sales and production, while defendant's marks had no established good will. Despite defendant's ready explanation for the selection of these names, its course of conduct, considered as a whole, shows an attempt to come as close as possible to a mark with a high degree of established good will. A similar implication from a defendant's conduct was made in Q-Tips, Inc. v. Johnson & Johnson, Inc., 3 Cir., 206 F.2d 144, certiorari denied 346 U.S. 867, 74 S.Ct. 106, 98 L.Ed. 377, where a second-comer chose a name very similar to that of plaintiff's well-established product from a list of "dozens of names * * * many of which [were] arbitrary, fanciful and completely unlike anything suggested by the plaintiff's product." [25]

3. Of course, the mere attempt to register a mark similar to an established mark is not enough alone to show the similarity is confusing. There must also be actual physical similarities between the names. Many multi-word marks with a single common word have been held confusingly similar when used on like products. For example, "Dixiana" and "Dixie Dew" were held confusingly similar to "Dixie Beau" and "Dixie Belle" when all were to be used on alcoholic beverages.[26] Similarly, "Q-Tips" was held infringed by "Cotton Tips"; [27] "White Horse" and "Black Horse" by "Red Horse"; [28] "Old Charter" by "Charter Oak"; [29] and "Four Roses" by "Maryland Rose." [30]

4. Besides the mere repetition of the common word "Gentleman," the marks in question also have a distinct similarity in that the varying word in each mark is a geographic modification of the common word. This dual relationship distinguishes this case from those cases without a double similarity like Nehi Corp. v. Mission Dry Corp., D.C.Del., 117 F. Supp. 116, affirmed per curiam 3 Cir., 213 F.2d 950, where this court held "Royal Crown" was not infringed by "Royal Punch." There, too, the marks were not being used on identical products.[31]

While there are obvious differences to the eye and ear between the marks in question when they are placed side-by-side, this is not the way they will confront the potential purchaser in the average case and this is not the context in which their similarity must be judged.[32] In fact, it has been held that in the case of alcoholic beverages, the degree of similarity need not be as high as usual since the likelihood of confusion

25. A similar implication of an intent to take a "free ride" on the popularity of an established product was made on similar facts in G. D. Searle & Co. v. Chas. Pfizer & Co., 7 Cir., 265 F.2d 385, 386, certiorari denied 361 U.S. 819, 80 S.Ct. 64, 4 L.Ed.2d 65.

26. Century Distilling Co. v. Continental Distilling Corp., 3 Cir., 205 F.2d 140, certiorari denied 346 U.S. 900, 74 S.Ct. 226, 98 L.Ed. 400.

27. Q-Tips, Inc. v. Johnson & Johnson, supra note 24.

28. D. J. Bielzoff Prods. Co. v. White Horse Distillers, 27 CCPA 722, 107 F.2d 583.

29. Old Charter Distillery Co. v. Continental Distilling Corp., D.C.Del., 174 F. Supp. 312.

30. Frankfort Distilleries, Inc. v. Kasko Distillers Prods. Corp., 111 F.2d 481, 27 CCPA 1189. The court there distinguished its prior finding that "Melrose" did not infringe "Maryland Rose" by the fact that the former was all one word.

31. In National Cranberry Ass'n v. Ingling 234 F.2d 877, 43 CCPA 984, the marks "Ocean Spray" and "Sea Spray" did have this double similarity, but there the marks were used on very dissimilar products and were held not infringing.

32. Telechron, Inc. v. Telicon Corp., D.C. Del., 97 F.Supp. 131, 142, affirmed 3 Cir., 198 F.2d 903.

is greater because drinks are frequently purchased at bars and clubs without the purchaser seeing any bottles or labels.[33] In such a case, it seems particularly likely that a customer might become confused between several brands of the same product when he can recall the one he wants only as a *"gentleman"* from some place. The defendant argues against confusion in such a case because the names in question would call up different "word pictures" to purchasers, i. e., "Virginia Gentleman" implies "the magic of the fox hunt, the manor house * * * and other associations of social distinction, leisure, and genteel, cultivated living," while "Indiana Gentleman" reminds one of "the river bottom and its cornfield; of James Whitcomb Riley, and 'the frost is on the punkin', * * * Booth Tarkington and 'The Gentleman from Indiana'"[34] However, if purchasers are likely to confuse the two marks, it is improbable that they will nevertheless be able to distinguish between their respective connotations.

▇▇▇▇ 5. The basic rule in deciding the similarity of multi-word marks is that they are to be viewed as a whole without "break[ing] the fagot stick by stick."[35] Because it has been concluded that there is confusing similarity between the three marks before this Court considering each as a whole, it is unnecessary to analyze them by the exception to this rule which calls for isolation and comparison of the "dominant" word in each mark.[36] Plaintiff's evidence and argument that "Gentleman" is the dominant work in its mark, however, does go to the establishment of the product's good will and to the basic point that the marks

are confusingly similar. For example, the evidence that a substantial number of plaintiff's purchasers refer to its bourbon merely as "Gentleman" (the practice is wide-spread enough in at least the District of Columbia area to allow newspaper columnists to refer to it as such) shows that the introduction of other geographically modified "Gentlemen" bourbons would be extremely likely to cause confusion among such customers.

The obvious likelihood that such similar marks might also lead to a "confusion of source" need not be considered here because of the finding of a likelihood of confusion between the products themselves. The "family" appearance of the trio of marks, though, does tend to suggest a common origin[37] and lends support to the ultimate finding of infringing similarity.

▇▇▇▇ 6. Upon consideration of the basic policy reasons behind the Lanham Act, the circumstances indicating conscious imitation, and the various aspects of similarity in the marks, it is clear that the plaintiff here is entitled to relief. The owner of a registered mark to which an established good will attaches is entitled to protection from the likelihood that a product with a similar name might grab a free ride on this good will. The purchasing public is entitled to protection from a situation where it is likely that similar names on similar products would lead to their confusion. The "second-comer" bears a "duty to so name and dress his product as to avoid all likelihood of consumers confusing it with the product of the first comer."[38]

▇▇▇ Plaintiff has as yet shown no actual damage from defendant's use of

---

33. Old Charter Distillery Co. v. Continental Distilling Corp., D.C.Del., 174 F. Supp. 312.

34. Defendant's Trial Brief, p. 16.

35. Joseph Schlitz Brewing Co. v. Houston Ice & Brewing Co., 250 U.S. 28, 29, 39 S. Ct. 401, 63 L.Ed. 822.

36. See, e. g., West Disinfecting Co. v. Lan-O-Sheen Co., 163 F.2d 566, 35 CCPA 706.

37. Century Distilling Co. v. Continental Distilling Co., 3 Cir., 205 F.2d 140, certiorari denied 346 U.S. 900, 74 S.Ct. 226, 98 L.Ed. 400; Williamson Candy Co. v. Ucanco Candy Co., D.C.Del., 3 F.2d 156; D. J. Bielzoff Prods. Co. v. White Horse Distillers, 107 F.2d 583, 27 CCPA 722.

38. Harold F. Ritchie, Inc. v. Chesebrough-Pond's, Inc., 2 Cir., 281 F.2d 755, 758.

the marks in question; therefore, no remedy beyond the injunction and cancellation prayed for is appropriate [39] at this time. Because of the disposition of the trademark infringement issue, it is unnecessary to consider the concurrent claim of unfair competition.[40] The relief requested may be granted on the basis of the infringement claim.

An appropriate order may be submitted.

### Separate Findings of Fact and Conclusions of Law.

### Findings of Fact.

1. Plaintiff is a Virginia corporation with its principal place of business at Sunset Hills, Virginia.[1]

2. Plaintiff is the owner of the registered trademark VIRGINIA GENTLEMAN, which designates one of its two brands of four-year old straight bourbon whiskey.[2] The VIRGINIA GENTLEMAN trademark registration (No. 347,081) was issued on June 15, 1937 and first used by plaintiff's predecessor in 1936 or early 1937.[3]

3. Defendant is a Delaware corporation with its principal place of business in New York, New York.[4] Defendant is the owner of two registered trademarks employing a geographical term coupled with the word GENTLEMAN. These marks are INDIANA GENTLEMAN (No. 674,292) and AMERICAN GENTLEMAN (No. 672,923),[5] also used on four-year old straight bourbon whiskey. These registrations issued on February 17, 1959 and January 20, 1959, respectively.[6] Each of these products was sold by defendant for the first time on March 6, 1958.[7]

4. Plaintiff's distillery was begun by Mr. A. Smith Bowman, Sr., in 1935 on his farm in Sunset Hills, Virginia.[8] Within a short time, his sons Smith, Jr., and DeLong associated with him in the distillery business.[9] Mr. Bowman, Sr., died in 1952[10] and DeLong Bowman is now President of plaintiff[11] and Smith Bowman, Jr., is Vice-President. The duties of Smith Bowman, Jr., and DeLong Bowman have been largely the same for the twenty-five years during which the distillery has been in operation.[12] DeLong Bowman is in charge of the operations of the distillery, as well as of the farm located on the premises.[13] Smith Bowman, Jr., is in charge of sales and public relations.[14]

5. The formula for VIRGINIA GENTLEMAN is the same as was used to make VIRGINIA GENTLEMAN twenty-five years ago.[15] The label on which the trademark VIRGINIA GENTLEMAN appears is the same label that has been used for twenty-five years.[16]

6. VIRGINIA GENTLEMAN is sold by plaintiff to the monopoly states[17] of Virginia, West Virginia, Pennsylvania, North Carolina, Alabama, Ohio, and to

39. Q-Tips, Inc. v. Johnson & Johnson, 3 Cir., 206 F.2d 144, certiorari denied 346 U.S. 867, 74 S.Ct. 106, 98 L.Ed. 377.

40. Harold F. Ritchie, Inc. v. Chesebrough-Pond's, Inc., 2 Cir., 281 F.2d 755, 762.

1. Tr. 9.

2. The other brand is FAIRFAX COUNTY, Tr. 42, 10.

3. Tr. 4, 10, 32.

4. Tr. 9.

5. Tr. 11.

6. PX 2 and 3 attached to plaintiff's motion for summary judgment.

7. Tr. 83.

8. Tr. 30.

9. Tr. 31, 72.

10. Tr. 33.

11. Tr. 72.

12. Tr. 34, 72.

13. Tr. 72.

14. Tr. 34.

15. Tr. 70.

16. Tr. 32–33.

17. A monopoly state is one in which the retail sale of bottled liquor is a state-owned monopoly. Tr. 35.

Montgomery County, Maryland, as well as to two wholesale liquor distributors who redistribute to retail outlets in all so-called open states and to the Armed Forces and other federal installations throughout the country.[18]

7. The ultimate consumer of VIRGINIA GENTLEMAN purchases it either by the bottle at retail stores or by the drink at clubs, bars, hotels, taverns, and restaurants.[19] One of the two wholesale distributors of VIRGINIA GENTLEMAN testified he made a specialty of selling VIRGINIA GENTLEMAN to clubs.[20] Three bartenders from private clubs also testified to its popularity at these clubs.[21] The Court takes judicial notice that bars, taverns, and clubs "are frequently noisy with the television set in operation and the din of voices, glasses and ice in the background. Hence the patron does not necessarily see the package nor is his order received under ideal acoustical conditions," Old Charter Distillery Co. v. Continental Distilling Corp., D.C.Del., 174 F.Supp. 312, 320–321. As stated in Wardall v. Camden County Beverage Co., 45 U.S.P.Q. 530, 531, "It is proper to give consideration to the fact that purchasers frequently order and buy whiskey and ale by the drink and without seeing labels or trademarks."

8. The sale of VIRGINIA GENTLEMAN has increased year by year, except for the period during which the effect of the wartime curtailment of production of commercial whiskey was present.[22] During the war, the facilities of plaintiff's distillery were devoted to the production of alcohol for the war effort,[23] and the effect of this failure to produce commercial whiskey is to be noted for several years after the war. The sales figures for 1943 through 1960 are as follows:[24]

Sales of "Virginia Gentleman"

| Year | Number of Cases | Sales Price f. o. b. Distillery |
| --- | --- | --- |
| 1943 | 43,628 | $ 786,566.71 |
| 1944 | 15,180 | 457,184.62 |
| 1945 | 21,631 | 736,749.68 |
| 1946 | 19,673 | 661,913.14 |
| 1947 | 23,051 | 908,846.74 |
| 1948 | 22,800 | 911,856.34 |
| 1949 | 22,616 | 883,402.74 |
| 1950 | 28,922 | 1,131,041.08 |
| 1951 | 50,017 | 1,993,569.47 |
| 1952 | 55,514 | 2,379,820.33 |
| 1953 | 62,577 | 2,713,625.30 |
| 1954 | 93,373 | 4,024,724.96 |
| 1955 | 93,106 | 4,061,311.43 |
| 1956 | 94,261 | 4,039,705.88 |
| 1957 | 98,476 | 4,350,445.52 |
| 1958 | 111,116 | 4,883,881.14 |
| 1959 | 120,053 | 5,316,960.60 |
| 1960 | 135,194 | 5,977,322.00 |

9. Despite continually increased sales, the demand for VIRGINIA GENTLEMAN has been in excess of the supply of plaintiff's product since 1943.[25] In 1943 the distillery began to ration its VIRGINIA GENTLEMAN because of the curtailment of commercial production of whiskey.[26] The whiskey plaintiff had on hand at that time was rationed to give each customer the same percentage of the product which he had been ordering before the war.[27] This rationing system for VIRGINIA GENTLEMAN has continued ever since, and the product is still being allocated, substantially on the same percentage basis.[28] In 1959 plaintiff wrote to its monopoly state customers asking them how much VIRGINIA GENTLEMAN they "might purchase were it

18. Tr. 35–37, 128.

19. Tr. 38, 128.

20. Tr. 128.

21. Tr. 106–107, 111, 113, 118–119.

22. Tr. 28, 36, 37–38, 42.

23. Tr. 36.

24. Tr. 28, 37–38.

25. Tr. 36.

26. Tr. 36–37.

27. Tr. 37.

28. Tr. 36, 127.

not rationed." [29] Each monopoly state replied it could sell substantially more of plaintiff's product if it were not rationed.[30] Virginia, which was receiving an allocation of 42,250 cases per year, indicated it could sell between 80,000 and 100,000 cases of VIRGINIA GENTLEMAN per year if it were not rationed.[31] West Virginia replied it could sell 50% more if it were not rationed.[32] Alabama, which was receiving an allocation of 550 cases per month, indicated it could absorb between 700 and 800 cases per month at a minimum.[33] Other replies were to like effect.[34]

10. Following these replies, the capacity of the distillery was increased 50% by putting in a new still and a new fermenting room which are not yet in operation.[35] When the new still and fermenting room are in operation, it is estimated, the capacity of the distillery will have been increased from its present 50 barrels per day to 75 barrels per day.[36] Since this will be four-year old bourbon whiskey, the increased capacity will not be available for commercial sale until at least four years after the new production facilities are put in operation.

11. The record contains advertisements of VIRGINIA GENTLEMAN which have appeared in the "Wall Street Journal," "Esquire," "The New Yorker," and "Holiday." [37] In 1959 about $54,000 was expended in advertising by plaintiff and its principal distributor.[38] This amount is a small expenditure for advertising, since sales of VIRGINIA GENTLEMAN in 1959 were in excess of $5,000,000. From this it appears exten-

sive good will attaches to the name VIRGINIA GENTLEMAN.

12. The record contains other evidence of the extensive good will which attaches to VIRGINIA GENTLEMAN. An article concerning the Bowman's and VIRGINIA GENTLEMAN appeared in the June, 1959 edition of "Fortune Magazine." [39] Other gratuitous mentions of VIRGINIA GENTLEMAN appeared in "The New Yorker" of January 28, 1956,[40] "The Foreign Service Journal" of October, 1959,[41] "The Washington Sunday Star" of October 25, 1959,[42] and in "Time" magazine of October 26, 1959.[43] Gratuitous mentions of VIRGINIA GENTLEMAN also appear in six novels which were published in 1947, 1949, 1951, 1953, 1957, and 1960.[44] Three of these novels were published in paperback editions as well as hard cover editions;[45] a fourth was a Book-of-the-Month Club selection.[46]

These references to VIRGINIA GENTLEMAN not only constitute valuable free advertising, but they also reflect an unique good will which attaches to plaintiff's trademark.

13. There is also evidence in the record that VIRGINIA GENTLEMAN is frequently referred to simply by the short-hand designation GENTLEMAN. Three bartenders testified VIRGINIA GENTLEMAN was frequently ordered simply as GENTLEMAN.[47] One of the bartenders testified 75% of his orders for VIRGINIA GENTLEMAN at the National Press Club were made as GENTLEMAN or GENT.[48] Two of the bartenders at trial spontaneously referred to

29. PX 2–A.

30. PX 2–B through PX 2–G.

31. PX 2–G.

32. PX 2–C.

33. PX 2–D.

34. PX 2–B, 2–E and 2–F.

35. Tr. 52.

36. Tr. 41–52.

37. PX 8–A through 8–H.

38. Tr. 27.

39. PX 1.

40. PX 7.

41. PX 10.

42. PX 11.

43. PX 12.

44. PX 5–A through PX 5–E and PX 9.

45. PX 6–A, 6–B, 6–E.

46. PX 6–C.

47. Tr. 107, 112, 119.

48. Tr. 119.

plaintiff's product, in their testimony, as GENTLEMAN.[49] A distributor for plaintiff also testified that in taking orders for plaintiff's product he hears frequent reference to it as GENTLEMAN.[50]

A foreign service officer testified he himself referred to plaintiff's product as GENTLEMAN as did his friends and associates,[51] and that he had heard frequent references to VIRGINIA GENTLEMAN as GENTLEMAN at cocktail parties which he attended.[52]

A newspaper columnist (who was a teetotaler) testified she had heard frequent reference to plaintiff's product as GENTLEMAN at various social gatherings.[53] Both the foreign service officer and the newspaper columnist, in columns appearing in "The Foreign Service Journal" and "The Washington Sunday Star," respectively, made written reference to plaintiff's product as GENTLEMAN without further identification.[54] References to VIRGINIA GENTLEMAN by the short-hand designation GENTLEMAN have also appeared in a novel.[55]

14. Defendant has not marketed either INDIANA GENTLEMAN or AMERICAN GENTLEMAN,[56] only two cases of each brand having been sold, and these only for the purpose of qualifying the marks for federal trademark registration.[57]

15. Defendant has not advertised either INDIANA GENTLEMAN or AMERICAN GENTLEMAN.[58]

16. Defendant decided to adopt the names INDIANA GENTLEMAN and AMERICAN GENTLEMAN approximately in 1957.[59] At that time its officers were aware plaintiff was selling whiskey under the name VIRGINIA GENTLEMAN.[60]

17. Defendant has also applied for registration of four other marks: THE VIRGINIAN, MR. VIRGINIA, VIRGINIA CITIZEN and VIRGINIA SETTLER.[61] On May 8, 1961 the Trademark Trial and Appeal Board of the Patent Office, acting upon plaintiff's opposition, denied registration to THE VIRGINIAN on the ground that THE VIRGINIAN was confusingly similar to VIRGINIA GENTLEMAN.[62] MR. VIRGINIA is presently the subject of a pending opposition in the Patent Office.[63] In its brief filed in this Court, defendant has stated that it has "decided to allow default judgment [against it] to be entered in the MR. VIRGINIA opposition proceeding.[64] The applications for VIRGINIA CITIZEN and VIRGINIA SETTLER have not yet been admitted to publication, and cannot be opposed in the Patent Office at this time.[65] Plaintiff has announced in its brief filed in the case at bar [66] its intention to file oppositions to these applications for registration in the event the Patent Office does admit them to publication. Defendant has not placed any of these brands on the market, having made only a few sales of each for the purpose of qualifying it for trademark registration.[67]

18. Defendant's explanation for adopting the four VIRGINIA names was that it had property in Virginia and, "Some day we wanted to erect a distil-

---

49. Tr. 112–113, 121.

50. Tr. 130–131.

51. Tr. 135–136.

52. Tr. 136.

53. Tr. 147.

54. PX 10 and PX 11.

55. PX 9.

56. Pre-trial Order, C. 6.

57. Pre-trial Order, C. 6; Tr. 83–84.

58. Pre-trial Order, C. 6.

59. Tr. 79–80.

60. Tr. 81–82.

61. Pre-trial Order, C. 7.

62. A. Smith Bowman & Sons, Inc. v. Schenley Distillers, Inc., Opposition No. 39,004.

63. Pre-trial Order, C. 7.

64. Defendant's Brief, p. 41.

65. Pre-trial Order, C. 7.

66. Plaintiff's Brief, p. 11, fn. 7.

67. Tr. 93–94, 95, 96–97.

lery" on that property.[68] These names were chosen in preparation for the time when it would market whiskey from such a distillery.[69] The distillery had not been erected, nor is there any indication as to when it will be erected.[70] Moreover, the whiskey from such a distillery could not be sold commercially for four years after it was distilled.[71]

19. Defendant introduced no oral testimony. Most of its exhibits consist of advertisements for whiskey not involved in this case. These are as follows:

a. An advertisement from "The Massachusetts Beverage Journal" of September, 1960 for OLD GENTRY gin, which is described as "The Gentleman's Gin."[72]

b. An advertisement from "The New York Times" of October 12, 1960 for MACKINLAY'S scotch whiskey which is described as "A gentlemanly whiskey."[73]

c. An advertisement from "The New York Times" of October 13, 1960 for THE ANTIQUARY, about which it is said, "For decades, this sublime whiskey has had more customers throughout the world than it could supply."[74]

d. An advertisement from "The New York Times" of November 14, 1936 for DEWAR'S scotch which states, "For a Gentleman's SCOTCH, ask for DEWAR'S."[75]

e. An advertisement from "The San Francisco Examiner" of November 25, 1936 for DEWAR'S scotch which describes it as "A Gentleman's Whiskey."[76]

f. An advertisement from "The New York Times" of December 18, 1936 for CUTTY SARK, which describes it as "A Gentleman's Drink."[77]

g. An advertisement from "The Foreign Service Journal" of October, 1959 for I. W. HARPER, which pictures a silhouette of a man in a high hat and tails, bowing.[78]

h. An advertisement from "The Cincinnati Enquirer" of September 21, 1960 for KENTUCKY COLONEL in which is pictured a goateed and moustached Kentucky colonel.[79]

i. A series of advertisements in various magazines for LORD CALVERT, each of which uses the familiar "man of distinction" theme.[80]

In addition, defendant has introduced a registration certificate (No. 582,886) for a silhouette of a man in a top hat, tails, and a cane, bowing, which is commonly used in advertisements for I. W. Harper.[81]

These exhibits show that purveyors of whiskey often suggest their particular product is one that gentlemen drink, but the fact advertising material for whiskey frequently states the particular whiskey involved is whiskey which gentlemen drink has little or no relevance to the specific issue involved in the case at bar.

20. The remainder of defendant's exhibits all deal with the expired Schenley trademark GENTLEMAN JIM.[82] This

68. Tr. 94.
69. Tr. 94.
70. Tr. 94–95.
71. Tr. 95.
72. DX 2.
73. DX 3.
74. DX 4.
75. DX 6.
76. DX 7.
77. DX 8.
78. DX 9.
79. DX 10.
80. DX 12–A through DX 12–E.

81. DX 11; See, DX 9.
82. The mark was originally registered by a Schenley affiliate, The Old Quaker Company, on December 4, 1934 (DX 1). On January 14, 1937, the Old Quaker Company assigned the trademark GENTLEMAN JIM to The Steinhardt Company, another Schenley affiliate (Tr. 98–99). The registration statement for GENTLEMAN JIM (DX 1) indicates the mark was later assigned to Schenley Distillers, Inc., the defendant in this suit (DX 1). Schenley will be referred to as owner of the mark, although at the time involved it may have been owned by an affiliate.

registration expired on December 4, 1954 and was not renewed.[83] Defendant has not used the trademark GENTLEMAN JIM since 1942.[84] It would appear defendant does not and cannot claim any rights under this abandoned mark.

In late 1936, Schenley became aware that the Buckingham Corporation, in connection with its advertising of CUTTY SARK was using the statement "A gentleman's drink," and that it was seeking to register the slogan with the Patent Office.[85] The Correspondence comprising DX 5–A through DX 5–F reflects Schenley's concern over CUTTY SARK'S use of the phrase "A gentleman's drink." Schenley based its objections to the use of this slogan on its own use of "A Gentleman's Scotch" in connection with its advertising of DEWAR'S Scotch, and also on its prior registration of GENTLEMAN JIM. Because Schenley's use of "A Gentleman's Scotch" did not antedate Buckingham's use of "A gentleman's drink,"[86] Schenley opposed Buckingham's registration of the slogan "A gentleman's drink" on the basis of Schenley's registration of GENTLEMAN JIM.[87] No answer to this opposition was filed; and registration of "A gentleman's drink" was denied.[88]

Defendant contends this episode reflects its own use of the word "Gentleman" in advertising and trademarks. However, the episode also lends support to the merit of plaintiff's claim, here. If, as Schenley contended in 1937, GENTLEMAN JIM is confusingly similar to "A gentleman's drink" (not even used as a trademark, but as a slogan), there is surely merit to plaintiff's contention the trademarks at issue here are confusingly similar.[89]

83.  Tr. 97.

84.  Tr. 102.

85.  DX 5–A.

86.  DX 5–D.

87.  DX 13.

88.  DX 13.

## Conclusions of Law.

1.  This Court has jurisdiction over the parties and the subject matter of this action. Jurisdiction of the trademark infringement action is grounded on 15 U.S.C.A. § 1121, 28 U.S.C. § 1338(a), and 28 U.S.C. § 1331. Jurisdiction of the unfair competition action is based on 28 U.S.C. § 1338(b) and 28 U.S.C. § 1332. Plaintiff is a citizen of Virginia. Defendant is a citizen of Delaware and New York, 28 U.S.C. § 1332(c). The matter in controversy exceeds, exclusive of interest and costs, $10,000, in accordance with the holding of Ambassador East, Inc. v. Orsatti, Inc., 3 Cir., 257 F.2d 79.

2.  The dominant word in each of the three marks involved in this case is the common word which they share, GENTLEMAN. The non-repetitive words in the marks are all geographical, two of the three being descriptive of the geographical source of the whiskey, "* * * A descriptive word has so little [or no] trademark significance as indicating origin of the goods, so that it cannot be considered as the dominant part of the mark."[90] Moreover, it is clear from the bartenders' testimony, as well as from an examination of the marks, that a purchaser would be more likely to remember the word GENTLEMAN than the geographical term. There can be no question that GENTLEMAN is the dominant word in all of the marks.

3.  VIRGINIA GENTLEMAN is an arbitrary and nondescriptive trademark. It has been created by using "common words in an arbitrary sense" to form plaintiff's designation for its whiskey.[91] As the Supreme Court said of a similar trademark, THE AMERICAN GIRL, as applied to shoes, "It does not, in its primary signification, indicate shoes at all.

89.  Cf. Old Charter Distillery Co. v. Continental Distilling Corp., D.C.Del., 174 F. Supp. 312, 324–325.

90.  West Disinfecting Co. v. Lan-O-Sheen Co., 163 F.2d 566, 569, 35 CCPA 706.

91.  Telechron, Inc. v. Telicon Corp., D.C. Del., 97 F.Supp. 131, 150, affirmed 3 Cir., 198 F.2d 903.

It is a fanciful designation, arbitrarily selected by complainant's predecessors to designate shoes of their manufacture."[92]

4. Since the products involved are identical, all being four-year old straight bourbon whiskeys, it will be inferred they will be sold through the same outlets; namely, package stores, clubs, bars, taverns, and restaurants.

5. Whiskey, both by the drink and by the bottle, is a relatively inexpensive product, frequently purchased casually, and without care or discrimination.[93]

6. Plaintiff contends the two marks involved in this case, INDIANA GENTLEMAN and AMERICAN GENTLEMAN, are only two in a series of six marks in which defendant is attempting to come as close to plaintiff's mark as it dares in an attempt to sell its product through the "diffused appeal of the plaintiff's symbol"[94] and by "the commercial magnetism"[95] of the various aspects of the symbol VIRGINIA GENTLEMAN which the plaintiff has created. Defendant has done this without any risk to itself, since it has not marketed any whiskey under any of these six brand names. Although plaintiff is not required to establish defendant's intention to infringe in order to prevail in an action for trademark infringement or unfair competition, the facts stated in ¶s 16, 17 and 18 of these findings of fact go deep in proving this intent here. Recognizing the difficulty of obtaining proof on an issue like this, it seems likely the defendant is consciously attempting to come as close as possible to plaintiff's mark and to profit by the public's posi-

tive reaction to a name that sounds like VIRGINIA GENTLEMAN. The choice of a single name so similar to VIRGINIA GENTLEMAN, as are all the marks discussed in this case, leads to this conclusion. The choice of six such marks in such a short period of time significantly swings the needle of the Court of Equity to the word Stop. When it is considered defendant was aware of plaintiff's product at the time it chose these names and it was unable to give a more convincing explanation of the four VIRGINIA type names, it is an understatement that the defendant is attempting to profit from the unusual good will which inheres in plaintiff's symbol VIRGINIA GENTLEMAN.

Defendant's intentional choice of the trademarks INDIANA GENTLEMAN and AMERICAN GENTLEMAN for the purpose of profiting by plaintiff's exploitation of VIRGINIA GENTLEMAN is, in itself, an indication the marks are confusingly similar for, in the absence of strong proof to the contrary, it must be assumed defendant's intention will bear fruit.

7. Considering defendant has copied the dominant word in plaintiff's arbitrary trademark with the intention of profiting by the similarity in the marks and has applied it to an identical and relatively inexpensive product intended to be sold through the same channels of trade, I am convinced confusion in the minds of purchasers is likely to result from their concurrent use of these trademarks. Moreover, such concurrent use is likely to result in actual confusion of

92. Hamilton-Brown Shoe Co. v. Wolf Bros. and Co., 240 U.S. 251, 256–257, 36 S. Ct. 269, 60 L.Ed. 629; see also, Aluminum Fabricating Co. of Pittsburgh v. Season-All Window Corp., 2 Cir., 259 F. 2d 314, 316.

93. Kellogg Switchboard & Supply Co. v. Talk-A-Phone Co., 219 F.2d 446, 448, 42 CCPA 766; Intercontinental Mfg. Co. v. Continental Motors Corp., 230 F. 2d 621, 623, 43 CCPA 841; Sleepmaster Products Co. v. American Auto-Felt Corp., 241 F.2d 738, 741, 44 CCPA 784.

94. Mishawaka Rubber and Woolen Manufacturing Co. v. Kresge Co., 316 U.S. 203, 206, 62 S.Ct. 1022, 1024, 86 L.Ed. 1381.

95. Ibid., 316 U.S. at page 205, 62 S.Ct. at page 1024.

goods, as well as confusion of source or commercial sponsorship. Confusion of goods is especially likely, because of the fact plaintiff's product is frequently referred to as GENTLEMAN and also because of the conditions under which the products are ordered in clubs, bars, and taverns. Confusion of goods would also be likely when a prospective purchaser of the plaintiff's product remembers only the dominant word in plaintiff's trademark. Even a prospective customer who is aware VIRGINIA GENTLEMAN and INDIANA GENTLEMAN and AMERICAN GENTLEMAN are different brand names would be likely to think that all three products came from the same commercial source. This is especially likely because of the defendant's use of GENTLEMAN as a family mark to designate two companion products and the frequency with which family marks are used in the liquor trade.[96]

8. Defendant is accordingly liable for trademark infringement and unfair competition.[97]

9. Plaintiff is entitled to an order enjoining defendant and all corporations, persons, and companies owned or controlled by defendant from using, in connection with distilled spirits, the trademarks INDIANA GENTLEMAN and AMERICAN GENTLEMAN or *any trademark* containing the word GENTLEMAN or GENTLEMEN preceded by a geographical location which would fall within the rule or ratio of the opinion of this Court filed herein on this date.

10. Plaintiff is also entitled to an order cancelling defendant's registration for INDIANA GENTLEMAN and AMERICAN GENTLEMAN, pursuant to 15 U.S.C.A. § 1119.

11. Costs to plaintiff will be settled at the time of entry of an order in plaintiff's favor.

96. D. J. Bielzoff Products Co. v. White Horse Distillers, Ltd., 107 F.2d 583, 585, 27 CCPA 722.

97. The test for determining both of these questions is, in this case, the same.